## Richmond

### PATRICK EDWARD ZUNIGA

v.

### COMMONWEALTH OF VIRGINIA

No. 1177-86-2

Decided December 20, 1988

COUNSEL

Michael J. Knowles (Roger L. Gregory; Arnold R. Henderson; Wilder, Gregory & Martin, on brief), for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

BENTON, J.—Patrick Edward Zuniga was convicted of conspiracy to distribute cocaine in violation of Code §§ 18.2-256 and 18.2-248. He was sentenced to forty years in the state penitentiary with twenty-two years suspended and was fined $10,000. Zuniga contends that his conviction should be overturned because (1) the evidence was not sufficient to show that he and Byron Samuels made an agreement to sell, give, or distribute cocaine in Virginia, (2) venue was improperly laid in Henrico County, where Samuels was arrested, and (3) the arrest warrant was defective. For the reasons that follow, we affirm the conviction.

I

On September 8, 1985, Zuniga arrived at a parking lot in Washington, D.C., in an automobile driven by Larry Smith. Zuniga and Samuels had previously arranged by telephone to meet at this location. Samuels got into the automobile and handed Zuniga approximately seven thousand dollars for eight ounces of cocaine. Zuniga counted the money and then handed it to Smith. Samuels did not have enough money and promised to pay Zuniga the additional sum of $3,000 "as soon as [he] sold [the cocaine]." Samuels told Zuniga that "[he] would have to sell the cocaine in Virginia" and that he would call him as soon as he got back to Washington the next day. That arrangement satisfied Zuniga.

The next day Samuels travelled with the cocaine to Robert Brice's house in the Richmond, Virginia area. Brice had a buyer for the cocaine. Once he received the cocaine, Brice made telephone calls to arrange a meeting with his buyer. The buyer, an undercover police officer, agreed to purchase the cocaine for $14,800. Brice and Samuels then went to a shopping mall in Henrico County to meet the buyer and were arrested when Brice

entered the officer's vehicle and displayed the cocaine.

After his arrest, Samuels agreed to cooperate with the Henrico police. He told them that he had bought the cocaine from Zuniga, whom he knew only as "Pat." Based on Samuels' description, the Henrico police obtained an arrest warrant against "one Cuban male, twenty-five years of age, five feet, four inches tall, weighing one hundred fifty pounds" for conspiracy to sell, give or distribute cocaine.

With the assistance of the Henrico police, Samuels called the telephone number that Zuniga had given him and allowed the police to record the following conversation:

ZUNIGA: Hello.
SAMUELS: Yeah, Pat.
ZUNIGA: Yeah, huh-huh
SAMUELS: Hey, what's up man?
ZUNIGA: What's happening?
SAMUELS: Yeah, this is Dave. Yeah, I was there last night with you.
ZUNIGA: What Dave was that?
SAMUELS: Huh?
ZUNIGA: What David?
SAMUELS: Dave, I made the deal with you last night?
ZUNIGA: Yeah, but where is David at? Oh, Dave.

\* \* \*

SAMUELS: Yeah I'm straight. Yeah, everything worked out, it was fine, man.
ZUNIGA: You got that for me
SAMUELS: Yeah I got it.
ZUNIGA: Uh,
SAMUELS: But, you know, I was planning on getting some more and all since the deal like double.
ZUNIGA: You want to do it, you want to get double of that?
SAMUELS: Yeah.

\* \* \*

ZUNIGA: But, ah, see this, this is the way we're going to do it, you got to get the money first man.

SAMUELS: OK

\* \* \*

ZUNIGA: I just can't take no chance.

\* \* \*

SAMUELS: Ok, I'll meet you about 10:30, 11:00, you know.
ZUNIGA: Between 10:30 and 11:00?
SAMUELS: Yeah, probably earlier because it's about that, over an hour drive from where I'm at.
ZUNIGA: Ok, so where are you at in Virginia?

Samuels told Zuniga that he would call upon his arrival in Washington, pay the $3,000 that he owed, and buy the additional quantity of cocaine.

After securing the cooperation of the Washington police, the Henrico police transported Samuels to Washington, where he again called Zuniga to arrange a meeting at the same parking lot. Zuniga and Smith arrived shortly thereafter and were arrested. During a later search of Zuniga's residence, the police found scales and three pounds of cocaine. They also learned that the phone number Zuniga had supplied Samuels was registered to Zuniga's residence.

## II

"Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982)(quoting *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)). "[A] defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act." *United States v. Bright*, 630 F.2d 804, 813 (5th Cir. 1980)(citation omitted). In order to establish the existence of a conspiracy, as opposed to mere aiding and abetting, the Commonwealth must prove "the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting." *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir. 1975), *cert. denied sub nom. Frazier v. United States*, 423 U.S. 1088 (1976). The agree-

ment is the essence of the conspiracy offense. *Amato v. Commonwealth*, 3 Va. App. 544, 553, 352 S.E.2d 4, 9 (1987). "[T]he Commonwealth must prove beyond a reasonable doubt that an agreement existed." *Floyd v. Commonwealth*, 219 Va. 575, 580, 249 S.E.2d 171, 174 (1978).

At the time of the sale in Washington, Zuniga knew that Samuels intended to sell the cocaine in Virginia. However, no evidence in the record, or reasonable inference drawn from this evidence, supports the conclusion that Zuniga was aware of any arrangements between Samuels and other dealers or sellers. Zuniga may well have believed that Samuels intended to dispose of the cocaine by direct sale, without entering into an agreement with a third person. Thus, although the evidence sufficiently establishes that Samuels and Brice conspired to distribute cocaine in Henrico County, there is no evidence that Zuniga knew of that conspiracy. Zuniga, therefore, argues that the Commonwealth failed to prove beyond a reasonable doubt the existence of an agreement to distribute cocaine, and that, for this reason, the evidence is insufficient to sustain the conspiracy conviction.

The Commonwealth asserts, however, that the evidence is sufficient to demonstrate an agreement between Zuniga and Samuels to distribute the cocaine in Virginia.[1] The Commonwealth specifically contends that evidence that Zuniga supplied on credit eight ounces of cocaine, which was later distributed in Virginia, coupled with evidence of Zuniga's knowledge that Samuels would sell the cocaine in Virginia, established beyond a reasonable doubt the existence of an agreement between the parties. We agree.

As a general rule a single buyer-seller relationship, standing alone, does not constitute a conspiracy. *See United States v. Walls*, 582 F. Supp. 1266 (N.D. W. Va. 1984); *Reed v. Commonwealth*, 213 Va. 593, 594, 194 S.E.2d 746, 747 (1973). Likewise, evidence of a distribution offense absent an agreement will not suffice to support a conspiracy conviction. *See Heacock v. Commonwealth*, 228 Va. 397, 407, 323 S.E.2d 90, 95-96 (1984)(where two individuals hosted a party in their home and

---

[1] The Commonwealth does not argue (1) that Zuniga conspired with Smith, who was present when the sale of cocaine occurred and who received the money from Zuniga, and (2) that Samuels became a party to that conspiracy. Accordingly, we do not address the transactions from that perspective.

invited the defendant, a drug dealer, who "supplied the cocaine free of charge" to the invited guests, "the distribution offense was committed, but there is nothing to show that it was the product of 'an agreement between two or more persons' to act in concert"). Evidence which merely establishes aiding or abetting in the commission of the distribution offense will not suffice to prove a conspiracy. *See id.* at 406-07, 323 S.E.2d at 95-96.

■ If, however, the evidence demonstrates: (1) "that the seller knows the buyer's intended illegal use," and (2) "that by the sale [the seller] intends to further, promote and cooperate in [the venture]," the existence of a conspiracy to distribute between a seller and a buyer, *inter se*, has been proved. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). The second element must be proved because "not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." *Id.* at 712. It is the proof of the second element which establishes the necessary preconcert and connivance which places the conduct beyond aiding and abetting.

In the present case, the Commonwealth has clearly borne the burden of proof regarding the first requisite element — knowledge by Zuniga that the substance sold would be used for an illegal purpose. Samuels testified that he informed Zuniga that he intended to sell the cocaine in Virginia. Moreover, it also is clear, by the nature of the commodity and by the quantity sold (eight ounces), that Zuniga should have known that the cocaine would be used and further distributed illegally. *See Direct Sales*, 319 U.S. at 711 (inherent nature of some articles to be put to illegal use makes a difference in quantity of proof required to show buyer will use the article unlawfully). Proof of such knowledge alone, however, is insufficient to convict Zuniga of conspiracy to distribute cocaine. *Id.* at 713. Therefore, the crucial issue to be determined here is whether the evidence demonstrates that "by the sale [Zuniga] intend[ed] to further, promote and cooperate in" Samuel's venture. *Id.*

In *Direct Sales*, the defendant, a mail-order wholesale drug company, was convicted of conspiracy to violate the Harrison

Narcotic Act.[2] "Direct Sales sold morphine sulfate to Dr. Tate in such quantities, so frequently and over so long a period [that] it must have known he could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally." *Id.* at 705. The Court found that the evidence further demonstrated that Direct Sales not only knew that Tate was using the drugs for illegal purposes, but also that Direct Sales "actively stimulated Tate's purchases." *Id.* As evidence that Direct Sales actively stimulated Tate's purchases, the Court noted that Direct Sales engaged in mass advertising and offered attractive discounts. The Court found that those commercial practices, inappropriate to the sale of restricted commodities such as opiates, evidenced "[t]he step from knowledge to intent and agreement . . . ." *Id.* at 713.

Although the evidence in this case does not establish that there was a "regular, sustained and prolonged" course of conduct prior to the September 8, 1985, transaction between Zuniga and Samuels, we conclude that such a course of conduct need not always be proved when the commodity is *per se* unlawful. The September 8, 1985 transaction between Zuniga and Samuels was not a mere, casual transaction, but rather, was in the nature of an arrangement consistent with "[t]he step from knowledge to intent and agreement." *Id.* Zuniga did more than simply supply cocaine to Samuels in return for payment. Zuniga sold the cocaine to Samuels on partial credit and expected payment of the balance "as soon as [Samuels] sold it" in Virginia. Such financing techniques, which may be innocuous in a normal commercial setting, evidence an inappropriate and sinister practice when used in the sale of commodities which are *per se* unlawful. *See id.* at 712. The extension of $3,000 credit to Samuels for the purchase of an illicit commodity allowed Samuels to successfully conduct his sale of narcotics in Virginia on reduced capital outlay. Zuniga thus facilitated, instigated, and actively stimulated Samuels' distribution scheme both by supplying the narcotics and by making the

---

[2] The conspiracy statute, in effect at that time, former 18 U.S.C. § 88, *amended by* 18 U.S.C. § 371 (1982), provided:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both.

purchase financially feasible.

That only one transaction was consumated between Zuniga and Samuels might be a material consideration if the transaction itself was "wholly lawful" or involved a lawful, yet restricted, commodity. *Id.* at 714-15. In this case, however, the substance involved was wholly *unlawful.* This difference is important in that it affects Zuniga's knowledge of Samuels' intended illegal use and "[s]o far as knowledge is the foundation of intent, the latter thereby also becomes the more secure." *Id.* at 711-12.

"Drug dealers must cultivate and maintain a familiar clientele of habitual drug users." *Heacock*, 228 Va. at 406, 323 S.E.2d at 96. Accordingly, an agreement to extend credit which has the effect of facilitating the creation or maintenance of a supply network forms the basis of a stake in the venture. Furthermore, the evidence sufficiently establishes that Zuniga, a drug dealer, had a stake in the venture because, by extending credit, Zuniga stood to make "profits which . . . come . . . from . . . encouragement of [Samuels'] illicit operations." *Direct Sales*, 319 U.S. at 713. Thus we can say of the arrangement in this case that:

> There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a "stake in the venture" which, even if it may not be essential, is not irrelevant to the question of conspiracy. . . . In such a posture the case does not fall doubtfully outside either the shadowy border between lawful cooperation and criminal association or the no less elusive line which separates conspiracy from overlapping forms of criminal cooperation.

*Id.* at 713.

The evidence need not show that Zuniga knew the entire scope or details of the plan of distribution. The evidence need only show that he knew of the essential nature of the scheme. *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). Zuniga did know that Samuel was planning to go into Virginia to sell the narcotics and that the sale would enable Samuels to return the following night and pay the amount advanced on credit.

■ By selling cocaine to Samuels and receiving a partial payment of less than the agreed price, Zuniga retained an interest in and maintained a continuing participation in Samuels' venture. By advancing the cocaine on credit, and in this manner insuring that Samuels could perform his obligations, Zuniga actively became a partner in the venture. Thus, Zuniga did more than merely acquiesce in or perform an arms length disinterested service in the scheme. The evidence and reasonable inferences support a finding that Zuniga was a drug dealer who agreed to a credit arrangement with Samuels, another drug dealer, in the hope of promoting future dealings.[3] The act of supplying the cocaine knowing that it would be sold in Virginia, plus the retained stake in the venture, evidenced by the credit arrangement, evince an agreement between and concert of action by the parties sufficient to prove conspiracy beyond a reasonable doubt. *See, e.g., Davis v. United States*, 279 F.2d 576, 578 (4th Cir. 1960).

### III

■ In *Henry v. Commonwealth*, 2 Va. App. 194, 342 S.E.2d 655 (1986), this Court held that venue in a conspiracy case is proper at the places where the agreement was made or where any act in furtherance of the conspiracy occurs. *Id.* at 198-99, 342 S.E.2d at 657-58. "[A]ll conspirators, even those without knowledge of the particular act, may be tried where any of those acts are performed." *Id.; see also United States v. Fahnbulleh*, 748 F.2d 473, 477 (8th Cir. 1984), *cert. denied*, 471 U.S. 1139 (1985). Accordingly, venue was proper in Henrico County where Samuels distributed the cocaine and placed the telephone call.

### IV

Zuniga contends that the arrest warrant which was issued in this case was defective because it did not provide "a description by which he can be identified with reasonable certainty." Code § 19.2-72. The record reflects that the warrant was issued September 9, 1985, following the arrest of Samuels. Officer Bolling ob-

---

[3] Although the telephone conversations, which occurred between Zuniga and Samuels after Samuels' arrest, could not form the basis of the drug conspiracy, they do provide evidence of Zuniga's pre-existing knowledge of the sale in Virginia and expectation that Samuels would return with the balance of Zuniga's money as agreed. *See United States v. Elledge*, 723 F.2d 864, 866 (11th Cir. 1984).

tained the warrant based upon the description of Zuniga that was provided by Samuels, the only known person who had met Zuniga at that time. We conclude that, under the circumstances, the warrant description satisfied the requirements of Code § 19.2-72. *See, e.g., United States v. Ferrone*, 438 F.2d 381, 389 (3d Cir.), *cert. denied*, 402 U.S. 1008 (1971). *See generally United States v. Doe*, 703 F.2d 745, 747 (3d Cir. 1983).

Accordingly, the judgment of conviction is affirmed.

*Affirmed.*

Coleman, J., and Cole, J., concurred.