COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Willis and Annunziata
Argued at Chesapeake, Virginia


KAWASKI BASS, S/K/A
 KAWASKI LAJUNE BASS
                                        OPINION BY
v.    Record No. 2554-98-1      JUDGE ROSEMARIE ANNUNZIATA
                                       JANUARY 27, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                     Randolph T. West, Judge

            Lyn M. Simmons for appellant.

            Kathleen B. Martin, Assistant Attorney
            General (Mark L. Earley, Attorney General,
            on brief), for appellee.


     Kawaski Bass appeals from his convictions of robbery and

use of a firearm in the commission of a felony.  He contends on

appeal 1) that the trial court erred in admitting statements of

his two codefendants as evidence in the guilt phase of the

prosecution, and 2) that without those statements the evidence

offered against him at trial was insufficient to sustain his

convictions.  We agree that the statements of Bass' codefendants

should not have been admitted against him at trial, but we find

that the admission of his codefendants' statements was harmless

error.  We therefore affirm his convictions.

FACTUAL BACKGROUND

In the late evening of February 1, 1998, Bass and two friends, Maurice Sirls and Julius Scott, drove in Scott's mother's car from Hampton, Virginia to a shopping center in Newport News. According to the statements of Bass and his codefendants, the three planned to rob customers as they exited a Food Lion grocery store located in the shopping center. Sirls had a .25 caliber chrome handgun with six bullets in it, and Scott had an unloaded Smith & Wesson. The three men entered the grocery store and identified their intended victims, Robert Randolph and his friend, Jacqueline James, who were shopping at the store shortly after midnight. Randolph bumped into Bass while in the store, triggering a short, innocuous exchange of words. When Randolph exited the store and walked toward his car, he saw Bass, Sirls, and Scott exit the store from another door. One of the three asked Randolph which way he was going. The men then moved in different directions, Sirls coming toward Randolph while Scott, and possibly Bass, approached from the other side of the car. As Randolph unlocked his car door, he heard someone behind him. Sirls pointed the small chrome handgun at Randolph and "instructed [him] to cooperate," threatening to shoot or kill him. Randolph told Sirls his money was in the top left pocket of his shirt. Sirls took $8 from

Randolph and a "handful of lollipops" from his pants pocket and ran from the scene with Scott and Bass.

At trial, Randolph identified all three suspects, but could not testify as to Bass' presence during the robbery. James could not identify any of the three assailants; she heard the men but did not see them. However, she saw a gun aimed at Randolph and felt something "hard" at the back of her head. After checking her pockets, one of the men took the bag of groceries from her hand before leaving the scene.

Officer Larry Rilee of the Newport News Police Department interviewed Bass and Sirls on April 21, 1998 at the Hanover County jail, where they had been detained. He interviewed Scott on April 28, 1998, at a detention center in James City County. Each of them made lengthy statements to Rilee recounting the events of the evening in question and providing an account of the robbery that took place.

Bass stated that on the evening in question he drove himself, Sirls and Scott in Scott's mother's car to the parking lot of a 7-Eleven store just across the street from a Food Lion grocery store located on Warwick Boulevard. Bass admitted that he drove his companions there knowing that they were armed and intended to commit a robbery. When asked by the police whether he, Sirls and Scott discussed committing a robbery while en route to the Food Lion, Bass replied, "Yeah." In response to

- 3 -

further questioning as to why Sirls and Scott had guns with them, Bass answered, "I guess they was going in to do a robbery. . . ." He stated that he and his two associates walked to the Food Lion and that on the way Sirls "cocked his .25 gun back," but Scott "didn't have no bullets in his gun." Bass stated that the three men browsed around in the store until they saw Randolph and James and that he, Sirls and Scott exited the store when they identified Randolph and James as their victims. According to Bass, Sirls at this point said to him, "Yo, let's get down," which Bass understood to be an invitation to participate in robbing Randolph and James. Bass replied, "Naw, uh-uh, I'm leaving," and, "Man, I'm turning around." Bass described the robbery that took place, however, stating that he was "away from the scene" of the robbery, having walked to "the end of the street," but admitting he could see tears running down James' cheeks when Scott told her to put her hands behind her head. Bass further stated that he could still see "the tears rolling down [James'] eyes" as the three fled. Bass also admitted that he helped Sirls and Scott effect their escape by driving them from the scene. In addition, he accurately described the clothes worn by Sirls and Scott on the evening in question.

Sirls stated that he went to the Food Lion in company with Bass and Scott and that Bass drove them to the 7-Eleven parking

lot in Scott's mother's car. According to Rilee's testimony, Sirls also stated that while driving to the store "they planned to do a robbery," in which they intended "just to pick a target at some point." He admitted that he and Scott were armed, and stated that Bass was unarmed. Sirls stated that he carried a .22 or .25 chrome handgun and that Scott was armed with a "wooden" or "antique" gun. Sirls described the robbery, indicating that once Randolph and James exited the Food Lion, Sirls approached Randolph, produced the chrome handgun, and robbed Randolph while Scott held a gun on James and checked her pockets for cash. He also accurately described the clothes worn by Bass and Scott. When asked where Bass was positioned during the robbery, Sirls stated that he "could have reached and touched [Bass], that's how close he was."

In his statement, Scott likewise stated that Bass drove the three defendants to the 7-Eleven parking lot, from which they walked to the Food Lion, and that while en route they discussed committing a robbery. He also stated that Bass alone of the three was unarmed, that Sirls carried a chrome handgun, and that he was armed with an old, "wooden" gun. He recounted how Sirls robbed Randolph while he robbed James, taking a bag of groceries from her, and that Bass fled the scene with him and Sirls. He finally noted that once they returned to the car they ate some of the groceries stolen from James.

- 5 -

Bass, Sirls and Scott were tried together, and none of them testified at trial. The Commonwealth offered the statements of all three men made in response to police questioning as evidence against Bass, introducing the statements through the testimony of Officer Rilee, and through a transcript of Bass' statement. Bass' objection to admitting the statements of his codefendants against him was overruled, in reliance upon our decision in Randolph v. Commonwealth, 24 Va. App. 345, 353, 482 S.E.2d 101, 104-05 (1997) (codefendant's hearsay statement admissible as a declaration against penal interest, a "'firmly rooted'" hearsay exception (quoting Raia v. Commonwealth, 23 Va. App. 546, 552, 478 S.E.2d 328, 331 (1996))); see also Chandler v. Commonwealth, 249 Va. 270, 455 S.E.2d 219, cert. denied, 516 U.S. 889 (1995); Morris v. Commonwealth, 229 Va. 145, 147, 326 S.E.2d 693, 694 (1985); Lewis v. Commonwealth, 18 Va. App. 5, 8, 441 S.E.2d 47, 49 (1994); Scaggs v. Commonwealth, 5 Va. App. 1, 4-5, 359 S.E.2d 830, 832 (1987). The court also denied Bass' motion to strike the evidence on the ground the Commonwealth had failed to present evidence connecting him with the offense.

## HEARSAY ANALYSIS

Whether evidence is admissible falls within the broad discretion of the trial court, and the court's ruling will not be disturbed on appeal absent an abuse of discretion. See Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 841 (1988).

By definition, when the trial court makes an error of law, an abuse of discretion occurs. See Taylor v. Commonwealth, 28 Va. App. 1, 9, 502 S.E.2d 113, 117 (1998) (en banc).

An accomplice's custodial confession that incriminates a codefendant is presumptively unreliable in the context of an alleged Confrontation Clause violation. See Lilly v. Virginia, 119 S. Ct. 1887, 1900 (1999) (plurality opinion); Lee v. Illinois, 476 U.S. 530, 541-43 (1986) ("[A] codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."). "[A] confession by an accomplice which incriminates a criminal defendant" should be considered a distinct category of hearsay for the purpose of determining its admissibility under the Sixth Amendment, Lee, 476 U.S. at 544 n.5, and this category of statements is not a "firmly rooted exception" to the hearsay rule.[1] See Lilly, 119 S. Ct. at 1897 (plurality opinion).

---

[1] The Supreme Court noted in Lilly that hearsay statements against the penal interest of the declarant are recognized as constituting "a firmly rooted exception" to the hearsay rule in Virginia. See 119 S. Ct. at 1894. The Court emphasized, however, that it does not regard accomplices' custodial confessions as falling within that exception in determining admissibility of such statements under the Confrontation Clause. See id.

The presumption of unreliability attaching to an accomplice's confession implicating a defendant may be rebutted,[2] although the bar for rebuttal of the presumption is set very high.[3]  See id. at 1900; Lee, 476 U.S. at 543.  The confession must be "supported by a 'showing of particularized guarantees of trustworthiness.'"  Id. at 543 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).  The particularized guarantees of trustworthiness necessary to rebut the presumption of unreliability must "be drawn from the totality of circumstances

---

[2] In Lilly, the Supreme Court observed:

> This [opinion] does not mean . . . that the [Sixth Amendment] Confrontation Clause imposes a "blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant."  Rather, it simply means that the Government must satisfy the second prong of the Ohio v. Roberts[, 448 U.S. 56 (1980),] test in order to introduce such statements.

119 S. Ct. at 1899 n.5.

[3] Justice Stevens' plurality opinion states:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice – that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

Lilly, 119 S. Ct. at 1900.

- 8 -

that surround the making of the statement and that render the declarant particularly worthy of belief." Idaho v. Wright, 497 U.S. 805, 820 (1990). Evidence admitted based upon the existence of particularized guarantees of trustworthiness must be so trustworthy that adversarial testing would add little to its reliability. See id. at 821.

Circumstances surrounding an accomplice's confession that weigh in favor of finding reliability include: (1) lack of knowledge on the part of the accomplice that he or she has already been implicated in a crime by a codefendant, (2) making the confession to authorities who were not aware of the confessor's role in the crime confessed, and (3) the exercise of any contemporaneous cross-examination by counsel or its equivalent. See Lee, 476 U.S. at 544.

In Wright, the Supreme Court held that evidence which corroborates the truth of an accomplice's confession is irrelevant to the determination of the confession's reliability. See 497 U.S. at 822 ("To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."). The use of corroborating evidence to establish a statement's reliability is "no substitute for cross-examination of the declarant at trial" and would allow the admission of

presumptively unreliable statements by bootstrapping on the trustworthiness of other evidence admitted at trial. Wright, 497 U.S. at 822-23. However, the Supreme Court in Wright did not reject the use of the interlocking character of codefendant confessions as probative of their reliability, but merely "declined to rely on corroborative physical evidence" in applying Lee's analysis. Id. at 824 (emphasis added); see Washington v. Rice, 844 P.2d 416, 427 n.5 (Wash. 1993) (en banc) (observing that Wright rejected only physical evidence as corroborative of a codefendant's "interlocking" confession, not the interlocking nature of the confessions themselves). Thus, under the Supreme Court's reasoning in Lee and Wright, where codefendants' statements "are identical in all material respects," such evidence may be considered because "the likelihood that they are accurate is significantly increased." 476 U.S. at 545. Such statements are considered to substantially "interlock," in that they "recite[ ] essentially the same facts as those of . . . nontestifying codefendants." Cruz v. New York, 481 U.S. 186, 190-91 (1987).

The degree to which such confessions must "interlock" to be admissible was defined in Lee as follows:

> If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of

- 10 -

> the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

476 U.S. at 545 (emphasis added). Conversely, an accomplice's statement that does not "interlock" with the defendant's statement may be admitted against the defendant if the areas of disagreement are irrelevant or trivial. See id. at 545. Before an accomplice's confession may be admitted, the court must be able to conclude that the declarant's truthfulness is so clear from the surrounding circumstances that cross-examination would be of "marginal utility." Wright, 497 U.S. at 823.

Finally, although a violation of the Confrontation Clause results when a court admits against a defendant an accomplice's interlocking confession that differs in substantial ways from the defendant's confession, if the admission of the accomplice's statement is found harmless beyond a reasonable doubt the error does not require reversal of the conviction. See Cruz, 481 U.S. at 193-94. In examining the record for harmless error, corroborating physical evidence may be considered, although it is an improper basis upon which to determine the reliability of the accomplice's statement. See Wright, 497 U.S. at 823-24.

Applying these principles to the issue before us, we find Bass met his burden to show that the trial court's decision was

erroneous.  See Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, cert. denied, 449 U.S. 1017 (1980).

We view the evidence in the light most favorable to the Commonwealth, the party prevailing below.  See Williams v. Commonwealth, 30 Va. App. 378, 381, 517 S.E.2d 246, 248 (1999).  All three defendants gave tape-recorded confessions to the police in response to questioning.  The accomplices' statements admitted against Bass came into evidence through the testimony of Officer Rilee.  They were unsworn and were not subject to cross-examination.  See Lee, 476 U.S. at 544.  Furthermore, Sirls and Scott were aware at the time they made the statements that they were facing charges of robbery, and the police were aware of the declarants' roles in the crime under investigation. See id. at 544, cited in Wright, 497 U.S. at 821.

Finally, the confessions of the three defendants were not substantially interlocking.  Sirls and Scott both said in their confessions that Bass was present during the robbery of the two victims.  Sirls offered an indicator of Bass' proximity, stating that while he held a gun to the chin of Robert Randolph, Bass stood close enough that Sirls "could have reached and touched him, that's how close he was."  Bass disagreed on this point. While admitting that he was close enough to see the "tears in the eyes" of the female victim, Jacqueline James, Bass described his location relative to the robbery as being "away from the

- 12 -

scene . . . at the end of the street," but close enough to see Sirls and Scott committing the robbery in the parking lot.  He replied to Sirls' invitation to participate in the robbery in the parking lot by saying, "Naw, uh-uh, I'm leaving. . . ."  When police asked Bass why he thought his companions were armed, he replied, "Because I guess they was going in to do a robbery."  (Emphasis added).

Under Lee, the defendant's confession must "thoroughly substantiate[ ]" those portions of his accomplices' confessions which bear upon the defendant's guilt to render their statements admissible against him.  See 476 U.S. at 545.  Here, the confessions do not thoroughly substantiate each other.  In his statement, Bass denied having participated in the robbery, claimed he was not in the parking lot when it occurred, and further stated he "was leaving" when Sirls and Scott made clear their plans to rob the two victims.  Sirls and Scott, however, placed Bass immediately at the scene, close enough that Sirls "could have . . . touched him."  This discrepancy is neither "irrelevant" nor "trivial," see Lee, 476 U.S. at 545, because the statements go to whether Bass' conduct was such that it supports his conviction as a principal in the second degree or as an accessory before the fact.  See Jones v. Commonwealth, 15 Va. App. 384, 387, 424 S.E.2d 563, 565 (1992) (an accused's mere presence and consent to the crime will not suffice to convict as

an accomplice (citing Underwood v. Commonwealth, 218 Va. 1045,
1048, 243 S.E.2d 231, 233 (1978))).  Furthermore, because Bass'
statement did not thoroughly substantiate those of Sirls and
Scott, and because the discrepancies in the confessions taken
from Sirls and Scott gave rise to the need for probative
cross-examination, we cannot say that cross-examination of the
declarants would have been only marginally useful.  See Wright,
497 U.S. at 823.

For the foregoing reasons, we hold that the trial court
erroneously admitted the statements of Sirls and Scott into
evidence against Bass.  We now examine whether this error was
harmless or whether it requires reversal of Bass' convictions.

### HARMLESS ERROR ANALYSIS

Where constitutional error occurs, the court must assess
whether the error was harmless beyond a reasonable doubt.  See
Lilly, 119 S. Ct. at 1901 (citing Chapman v. California, 386
U.S. 18, 24 (1967)).  Confrontation Clause error is a federal
constitutional error subject to harmless error analysis.  See
Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  "'[B]efore a
federal constitutional error can be held harmless, the court
must be able to declare a belief that it was harmless beyond a
reasonable doubt.'"  Lilly v. Commonwealth, 258 Va. 548, 551,
___ S.E.2d ___, ___ (1999) (quoting Chapman, 386 U.S. at 24).
"This standard requires a determination of 'whether there is a

- 14 -

reasonable possibility that the evidence complained of might have contributed to the conviction.'"  Id. at 551, ___ S.E.2d at ___ (quoting Chapman, 386 U.S. at 23).

> In making [a] determination [of such reasonable possibility], the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

Id. at 551, ___ S.E.2d at ___.

In determining whether an erroneously admitted codefendant statement incriminating a defendant constituted harmless error, the interlocking nature of the codefendant's and defendant's statements may also be considered in assessing whether the error contributed to the defendant's conviction.  See Cruz, 481 U.S. at 190-91 (citing Harrington v. California, 395 U.S. 250, 253 (1969)); Preston v. Florida, 641 So.2d 169, 171 n.7 (Fla. 1994) (observing Cruz noted that interlocking confessions may be considered for purposes other than reliability of the statements, including harmlessness of error).  Where the defendant makes no attempt to disclaim his own confession which closely interlocks with the confession of non-testifying accomplices, the error may be deemed harmless.  See Cruz, 481 U.S. at 193-94.

It is well established that an accused cannot be convicted solely on his or her uncorroborated extrajudicial confession. See Phillips v. Commonwealth, 202 Va. 207, 210-11, 116 S.E.2d 282, 284-85 (1960). Rather, the corpus delicti of an offense must be established by such substantial corroborative circumstances as will, when taken in connection with the confession, establish the corpus delicti beyond a reasonable doubt. See id. at 211, 116 S.E.2d at 285. The corpus delicti of an offense is the fact that the crime charged has been actually perpetrated, meaning "'objective proof or substantial fact that a crime has been committed.'" Claxton v. City of Lynchburg, 15 Va. App. 152, 154, 421 S.E.2d 891, 893 (1992) (citation omitted).

"To show an accused guilty of a crime as a principal in the second degree, the Commonwealth must show that the accused was present, aiding and abetting, and intended his or her words, gestures, signals, or actions to in some way encourage, advise, urge, or in some way help the person committing the crime to commit it." McGill v. Commonwealth, 24 Va. App. 728, 733, 485 S.E.2d 173, 175 (1997) (citing Ramsey v. Commonwealth, 2 Va. App. 265, 269, 343 S.E.2d 465, 468 (1986)). A person accused as an accomplice is accountable for all crimes committed by his or her confederates in furtherance of the criminal enterprise, even though the accomplice may never have intended

- 16 -

that a particular crime would be committed. See Jones, 15 Va. App. at 387, 424 S.E.2d at 565 (citing Boggs v. Commonwealth, 153 Va. 828, 836, 149 S.E. 445, 447 (1929)) (additional citation omitted).

"[E]vidence [that] establishes that the accomplice was . . . present . . . at a convenient distance" is sufficient to establish the accomplice's presence at the crime scene. McGhee v. Commonwealth, 221 Va. 422, 425 n.2, 270 S.E.2d 729, 731 n.2 (1980). However, the accused's mere presence and consent to the crime will not suffice to convict as an accomplice. See Jones, 15 Va. App. at 387, 424 S.E.2d at 565 (citing Underwood v. Commonwealth, 218 Va. 1045, 1048, 243 S.E.2d 231, 233 (1978)). The accused "'must share the criminal intent of the party who actually committed the [crime] or be guilty of some overt act in furtherance thereof.'" Jones, 15 Va. App. at 387, 424 S.E.2d at 565 (quoting Augustine v. Commonwealth, 226 Va. 120, 124, 306 S.E.2d 886, 889 (1983)).

Applying the law to the facts of this case, we find the trial court's error in admitting the accomplices' statements to be harmless. Bass' statement to the police admitted that he accompanied Sirls and Scott to the Food Lion store on the evening in question and that he drove them there knowing that they were armed and intended to commit a robbery. He stated that he and his cohorts walked around in the store until they

- 17 -

saw Randolph and James and that he exited the store with Sirls and Scott when they identified Randolph and James as their victims. He further admitted that, despite declining Sirls' invitation to assist in the robbery, he stood close by until his cohorts completed their crime, then fled with them, helping Sirls and Scott effect their escape by driving them from the scene. He also accurately described the clothes worn by Sirls and Scott on the evening in question. The only significant difference between his account and that of Sirls was in respect to Bass' proximity to the robbery.

The accounts given by Sirls and Scott match Bass' statement in their material respects. All three individuals agreed that they went to the Food Lion store together, that Bass drove them in Scott's mother's car, and that discussion of the robbery took place on the way. The three accounts were also consistent concerning the manner in which Sirls and Scott were armed, in reporting that Bass was unarmed, and in describing how Sirls robbed Randolph while Scott held a gun on James and checked her pockets for cash. Sirls and Bass also accurately described the clothes worn by each codefendant, though no statement by Scott was offered into evidence on this point. The only material respect in which Sirls' account differed from Bass' was in Sirls' assertion that Bass stood so close to him during the robbery that Sirls could have touched him. Scott's statement

differed from Bass' only in his statement that once the three returned to the car, he, Bass and Sirls ate some of the groceries taken from James.  In short, the only respects in which the accounts of Sirls and Scott differ from that of Bass are Bass' proximity to the robbery as it occurred, and whether Bass ate any of the groceries taken from James.

Although the confessions were not sufficiently interlocking to permit their admission under the principles of Lee, 476 U.S. at 545-46, their substantially interlocking nature, when considered together with the other evidence in the case, establishes the foundation for finding harmless error.  Bass' own statement, taken in conjunction with the testimony of the two crime victims, beyond any reasonable doubt places him at the scene of the robbery in question, aiding and abetting Sirls and Scott and acting in furtherance of their crime.  The testimony of the two victims established they were robbed, and they identified all three codefendants as being present at the Food Lion store just prior to the robbery.  Randolph also identified Sirls and Scott as the robbers, and stated that Bass was present while Sirls and Scott committed the crime.  More importantly, Bass admitted that he drove Sirls and Scott to the Food Lion store on the evening in question, that he knew of the plan to commit a robbery, that he knew his confederates were armed, and that he knew they brought their weapons into the store in order

to commit a robbery.  Although Bass stated he declined to participate directly in the robbery of the two victims when invited to do so, he admitted that while Sirls and Scott robbed the two victims, he waited at a distance close enough to the crime scene to see the female victim crying.  Bass further admitted that after the robbery was completed, he fled with Sirls and Scott, and that he drove them away from the scene of the robbery.  The evidence thus establishes that Bass aided Sirls and Scott in a criminal enterprise, by driving them to the Food Lion store, knowing their intent to commit a robbery, and by helping them escape after the robbery was completed.  These admissions evidence his participation in a common criminal enterprise with Sirls and Scott, and fully support his conviction of robbery as a principal in the second degree.  See Jones, 15 Va. App. at 387, 424 S.E.2d at 565.

According the accomplices' statements their full prejudicial value, see Schneble v. Florida, 405 U.S. 427, 432 (1972), we find that the accounts of Sirls and Scott add nothing significant to the other evidence in the case, particularly the picture painted by Bass' own statement depicting himself as a principal in the second degree.  Under the accomplice theory which underlies his conviction, it matters not whether Bass stood shoulder to shoulder with Sirls as the latter held a gun to Randolph or whether he ate any of the stolen groceries

afterward. The evidence provided by Bass himself unquestionably revealed that he was aware of his companions' criminal purpose and that he acted in furtherance of that purpose by driving them to the store, waiting while they perpetrated the robbery, and driving them from the scene. Thus, even viewing the erroneously admitted accomplice confessions with an eye toward their full damaging potential to Bass' defense, the remaining evidence of Bass' guilt is overwhelming, see id., and establishes no "'reasonable possibility that the [improperly admitted] evidence . . . contributed to the conviction,'" or that a different verdict might have been reached but for the admission of the accomplice statements. Lilly, 258 Va. at 551, ___ S.E.2d at ___ (quoting Chapman, 386 U.S. at 23); see Schneble, 405 U.S. at 432 (whether improperly admitted testimony required reversal of conviction depended upon whether the evidence was sufficiently prejudicial to defendant; if there was no "reasonable possibility" that the evidence contributed to the conviction, reversal was not required); Harrington, 395 U.S. at 254. It is thus clear beyond a reasonable doubt that the admission of the accomplice confessions was harmless error. See Schneble, 405 U.S. at 432; Lilly, 258 Va. at 551, ___ S.E.2d at ___.

Because we find that the admission of Sirls' and Scott's statements inculpating Bass was harmless error, we affirm the judgment of the trial court.

<u>Affirmed</u>.
