COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judge Annunziata and Senior Judge Willis
Argued at Alexandria, Virginia


FELIPE FRANCO

v.        Record No. 0222-03-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE ROSEMARIE ANNUNZIATA
FEBRUARY 10, 2004


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Benjamin N. A. Kendrick, Judge

William B. Cummings for appellant.

Kathleen B. Martin, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Felipe Franco appeals his convictions for distribution of cocaine in violation of Code

§ 18.2-248 and conspiracy to commit a felony (distribution of cocaine) in violation of Code

§ 18.2-256.  He contends the Commonwealth's evidence was insufficient to support the

convictions beyond a reasonable doubt.  For the reasons that follow, we affirm.

I.  Background

The evidence, viewed in the light most favorable to the Commonwealth, the party

prevailing below, together with all the reasonable inferences that may be drawn, Garcia v.

Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003), establishes that the instant

charges resulted from cocaine purchases made by undercover officers of the Arlington County

Police Department between September 2000 and May 2001.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

A confidential source introduced Officer Eric Valentine to Giovanni Bonilla and arranged for Valentine to purchase cocaine from him on October 18, 2000 at a fast-food restaurant in Arlington. After Valentine purchased one ounce of cocaine for $950, Bonilla agreed to conduct future deals directly with Valentine. Valentine made subsequent purchases from Bonilla on November 16, 2000, December 5, 2000, February 2, 2001, February 6, 2001 and March 20, 2001. He arranged the purchases by telephone, and they took place at the same restaurant as did the first transaction.

Bonilla was arrested on October 17, 2001 and charged with five counts of distribution of cocaine. He pled guilty and was awaiting sentencing at the time of Franco's trial.

Bonilla testified that he met Franco in 2000 at Manuel's Chiviata, a gambling house in Washington, D.C. where drugs were distributed. He testified that he obtained all the cocaine he sold to Valentine from Franco. Bonilla said he telephoned Franco each time Valentine contacted him and then met Franco "on the street" in D.C. to pick up the cocaine. Franco charged Bonilla $750 for one ounce but was not immediately paid for the supply. Bonilla sold the cocaine to Valentine for "$850, sometimes $900" in order to "make some money." Within a day or two of the transaction, Bonilla paid Franco with the proceeds.

Valentine was introduced to Rubin Arbaisa by the same confidential source that had arranged for the transaction between Valentine and Bonilla. Between September 2000 and March 2001, Valentine purchased over seven ounces of cocaine from Arbaisa for approximately $6,000.

On May 1, 2001, Valentine telephoned Arbaisa to arrange to buy 125 grams of cocaine for $3,200. Valentine called Arbaisa on the morning of May 3, 2001 to confirm the deal; the men arranged to meet later that afternoon at a fast-food restaurant in Rosslyn. Valentine was dropped off near the restaurant by his partner, Detective Giles. When Arbaisa arrived, he said he

wanted to conduct it in "his man's truck," and pointed to a green Toyota Four-Runner, parked nearby. Franco was sitting in the driver's seat of the vehicle. Valentine declined to conduct the purchase in the truck because he did not know Franco. The transaction therefore occurred in Valentine's car. As Valentine walked past the truck, he saw Franco exit the vehicle and stand on a small retaining wall. Franco remained there, staring in the direction of the transaction, until Valentine and Arbaisa completed it. A police videotape of the transaction was played for the jury.

Bonilla was acquainted with Arbaisa and testified that he saw Arbaisa and Franco near the gambling house in 2001 on a day that he described as "hot already." Franco and Arbaisa were in a blue or green Toyota truck, and Franco related to Bonilla that he was going to Virginia to "drop off some drugs."

Arbaisa was arrested on August 22, 2001 and subsequently pled guilty to three charges of selling cocaine to Valentine. He initially cooperated with the government and disclosed that Franco provided him with the cocaine he sold to Valentine. At trial, however, after being housed in the same unit at the jail as Franco, Arbaisa testified for the defense, stating that he asked his "friend Felipe" to give him a ride to Arlington on May 3, 2001. Arbaisa explained at trial that he already had the drugs when he asked Franco for the ride to Virginia and that, although he was going there to sell drugs to Valentine, he told Franco that the trip was necessary in order to get some money to pay his child. According to Arbaisa's trial testimony, his source of the drugs he sold to Valentine was "a guy in New York."

On cross-examination, Arbaisa acknowledged that he signed a statement for the police, stating that he had obtained cocaine from Franco and that Franco, driving a green Four-Runner, accompanied him once to Virginia.

Three witnesses for the Commonwealth testified to their association with Franco. Lewis Estrada Fuentes testified that he loaned Franco $2,500. In repayment, Franco gave him 125 grams of cocaine. Fuentes attempted to sell that cocaine, but his purchaser complained about its poor quality and accepted only half of the 125 grams. Fuentes informed Franco of the problem and returned to him the remaining 63 grams, which Franco agreed to replace with better quality cocaine.

Jeffry Manchester testified that Franco supplied him with cocaine in "user amounts" worth about $50 and that Franco did not appear to have a job in which he kept regular hours.

Angel Trejo testified that he met Franco at the Chiviata in the summer of 2000. Trejo testified that he once saw Franco at the Chiviata empty a gym bag containing 50 small bags of what appeared to be one-ounce pieces of cocaine. Later, he saw Franco leave the Chiviata with the empty bag. He also saw Franco at the Chiviata with large amounts of cash ranging from $5,000 to $10,000 and saw Franco and Arbaisa together there. Trejo also related a conversation that he had with Franco at the Arlington jail two or three months before Franco's trial. In that conversation, Franco said he had gone with Arbaisa "to deliver some stuff" and that he was "caught in the video." Franco also stated that he "was going to beat [the charge] because actually he [was] going to have [Arbaisa] testify that he had nothing to do with it." Franco told Trejo that he was not worried about the case because Arbaisa "was still working for him."

The Commonwealth also presented evidence of transactions made in a savings account that Franco maintained at the Chevy Chase Bank in Maryland. The bank records showed he made numerous deposits and withdrawals and that, on several occasions, he endorsed and deposited checks and money orders that had been made out to other persons.

David Crosby, special agent with the federal Drug Enforcement Administration (DEA), worked with the Arlington police on the case. A Dialed Number Recorder (DNR), placed on the

telephones of Franco, Arbaisa and Bonilla by the DEA, showed the time, date and duration of incoming and outgoing calls; the content of the calls, however, was not recorded. Barry Fink, an intelligence analyst with the DEA, reviewed the DNR reports. Between January 2001 and May 2001, 208 telephone calls were made from Franco's cell telephone to Bonilla's telephone, and 27 were made from Bonilla to Franco. The report documented 126 calls from Franco's number to Manchester's number. In March 2001, three calls were made from Fuentes's cell telephone to Franco's telephone. Between September 2000 and May 2001, 201 calls were made from Franco's telephone to Arbaisa's telephone, and 331 calls were made from Arbaisa to Franco between August 2000 and May 2001. Timelines for the dates Valentine purchased cocaine from Bonilla and Arbaisa were introduced as Commonwealth's exhibits.

After the close of all the evidence, Franco moved to strike the evidence on the ground that it was insufficient to prove that he distributed cocaine to Valentine on May 3, 2001, as a principal in the second degree. The motion was denied. The trial court also denied his motion to strike the evidence as insufficient on the conspiracy count. He was convicted on both counts and sentenced to seven years incarceration for distribution of cocaine, and twenty years incarceration for conspiracy to distribute cocaine. This appeal followed. For the following reasons, we affirm his convictions.

## II. Analyisis

### A. Standard of Review

When the sufficiency of the evidence is challenged on appeal, this Court "must view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth." Garcia, 40 Va. App. at 189, 578 S.E.2d at 99. The Court must therefore "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be

drawn therefrom." Holsapple v. Commonwealth, 39 Va. App. 522, 528, 574 S.E.2d 756, 758-59 (2003) (en banc) (citations omitted). This Court may not disturb the fact finder's verdict unless it is plainly wrong or without evidence to support it. Id. at 538, 574 S.E.2d at 763.

### B. Distribution of Cocaine

To prove that Franco distributed cocaine in violation of Code § 18.2-248, the Commonwealth was required to prove that he possessed a controlled substance and that he had the specific intent to distribute the substance while he possessed it. Wilkins v. Commonwealth, 18 Va. App. 293, 298, 443 S.E.2d 440, 444 (1994); Stanley v. Commonwealth, 12 Va. App. 867, 869, 407 S.E.2d 13, 15 (1991). The Commonwealth proceeded on a theory that Franco acted as a principal in the second degree, aiding and abetting Arbaisa in the cocaine deal on May 3, 2001. "[E]very principal in the second degree may be indicted, tried, convicted and punished as if a principal in the first degree." Allard v. Commonwealth, 24 Va. App. 57, 62, 480 S.E.2d 139, 141 (1997) (citing Code § 18.2-18). In order to prove that a defendant acted as a principal in the second degree, "'the Commonwealth must show that the accused was present, aiding and abetting, and intended his words, gestures, signals or actions to in some way encourage, advise, urge, or in some way help the person committing the crime to commit it.'" Bass v. Commonwealth, 31 Va. App. 373, 389, 523 S.E.2d 534, 542 (2000) (quoting McGill v. Commonwealth, 24 Va. App. 728, 733, 485 S.E.2d 173, 175 (1997)). "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal or party who commits the crime." Triplett v. Commonwealth, 141 Va. 577, 586, 127 S.E. 486, 489 (1925).

The evidence in this case established that the defendant aided and abetted Arbaisa in the distribution of cocaine on May 3, 2001. It shows that the transaction was arranged by telephone calls made between Officer Valentine and Arbaisa and between Arbaisa and Franco. After the

purchase of drugs was arranged, Bonilla testifed that he saw Franco on a "hot day" and that Franco told him he was going to Virginia to "drop off some drugs." A videotape of the resulting transaction was played for the jury, from which it could directly evaluate the degree of Franco's participation in the deal. "A defendant may be convicted as a principal in the second degree if he or she is present, 'keeping watch or guard at some convenient distance.'" Allard, 24 Va. App. at 63, 480 S.E.2d at 142 (quoting Rollston v. Commonwealth, 11 Va. App. 535, 540, 399 S.E.2d 823, 826 (1991)). "'Proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, . . . the jury [may] infer that he assented thereto.'" Pugliese v. Commonwealth, 16 Va. App. 82, 93-94, 428 S.E.2d 16, 25 (1993) (quoting Foster v. Commonwealth, 179 Va. 96, 99-100, 18 S.E.2d 314, 316 (1942)).

Franco's involvement with the transaction was further proved by evidence that, when Arbaisa met Valentine at the pre-arranged location for the transaction, he suggested the deal take place in "his man's truck," and he pointed to Franco's vehicle, which was parked nearby. After Valentine declined the invitation, Arbaisa went with Valentine to Valentine's car to complete the deal, and Franco got out of his truck and stood on a nearby retaining wall, watching the transaction. There is no evidence in the record that Franco disapproved or opposed the transaction between Arbaisa and Valentine, a failure to act that gives rise to the inference that Franco was aiding and abetting the transaction. See Pugliese, 16 Va. App. at 93-94, 428 S.E.2d at 25. Although Arbaisa testified that Franco was not involved with the deal, the jury was entitled to disregard that testimony in favor of: (1) Arbaisa's admission on cross-examination that he told police that Franco supplied him with the cocaine for the deal, and (2) the videotape and Valentine's testimony that revealed Franco's role as a lookout. See Carter v. Lambert, 246 Va. 309, 314, 435 S.E.2d 403, 406 (1993) (noting that a jury is entitled to disregard conflicting

- 7 -

testimony); see also Barker v. Commonwealth, 230 Va. 370, 373, 337 S.E.2d 729, 732 (1985) ("the credibility of witnesses and the weight to be given their testimony are questions exclusively within the province of a jury"). Finally, we note that, subsequent to the transaction, Franco told Trejo he had gone with Arbaisa "to deliver some stuff" and was "caught in the video." He also told Trejo that Arbaisa "was still working for him" and he "was going to beat [the charge] because actually he [was] going to have [Arbaisa] testify that he had nothing to do with it."

In summary, the jury could reasonably infer from all the evidence, viewed in its totality, that Franco knew Arbaisa was going to sell cocaine to Valentine, that he supplied him with the drugs, and that he further had participated in the deal by driving Arbaisa to the site and acting as a lookout. See Barlow v. Commonwealth, 26 Va. App. 421, 430, 494 S.E.2d 901, 905 (1998); see also Rollston, 11 Va. App. at 548, 399 S.E.2d at 831 (upholding murder conviction on theory that defendant was a principal in the second degree where evidence proved defendant acted as a lookout). We find no error in the conviction of Franco for distribution of cocaine.

### C. Conspiracy to Distribute Cocaine

We find the evidence was likewise sufficient to convict Franco of conspiracy to distribute cocaine. To convict Franco of conspiracy to distribute cocaine, the Commonwealth was required to prove there was an agreement between Franco and one or more persons "by some concerted action to commit an offense." Gray v. Commonwealth, 260 Va. 675, 680, 537 S.E.2d 862, 865 (2000). An "agreement is the essence of a conspiracy offense." Zuniga v. Commonwealth, 7 Va. App. 523, 527-28, 375 S.E.2d 381, 384 (1988). Normally, "a single buyer-seller relationship, standing alone, does not constitute a conspiracy." Id. at 528, 375 S.E.2d at 385. "If, however, the evidence demonstrates: (1) 'that the seller knows the buyer's intended illegal use,' and (2) 'that by the sale [the seller] intends to further, promote and cooperate in [the venture],' the existence of a conspiracy to distribute between a seller and a buyer, *inter se*, has

been proved." Id. at 529, 375 S.E.2d at 385 (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)) (alterations in original).

The jury reasonably inferred from the evidence presented here that Franco had conspired with Bonilla and Arbaisa to distribute cocaine. With respect to Bonilla, between October 18, 2000, and March 2001, the evidence showed that Bonilla sold Officer Valentine approximately eight ounces of cocaine worth a total of $7,450. Bonilla testified that the deals were arranged by telephone; after Valentine called Bonilla, Bonilla called Franco, and Bonilla then met Franco to get the cocaine that he sold to Valentine. Bonilla did not pay for the cocaine at the time he received it from Franco; rather, Bonilla paid Franco for the cocaine only after he completed the sale and was paid by Valentine. Franco demonstrated a continuing interest in the proceeds; Bonilla testified that "sometimes [Franco would] call to find out if I already had it or sometimes I'd call him." From this evidence establishing that Franco supplied Bonilla with cocaine on credit over a period of several months, the jury could infer that (1) Franco knew Bonilla was reselling the cocaine and (2) that Franco "thus facilitated, instigated, and actively stimulated [Bonilla's] distribution scheme both by supplying the narcotics and by making the purchase financially feasible." Zuniga, 7 Va. App. at 530-31, 375 S.E.2d at 386.

The evidence further establishes that a conspiracy or agreement to distribute cocaine existed between Franco and Arbaisa. Telephone records established that Arbaisa contacted Franco after Valentine arranged to buy drugs from Arbaisa. Franco drove Arbaisa to meet Valentine on May 3, 2001, and later admitted to Trejo in jail that he had gone "to deliver some stuff." He similarly admitted to Bonilla on May 3, 2001, that he had gone to "deliver some drugs." Arabaisa asked Valentine to complete the deal in "his man's truck" where Franco sat in the driver's seat. After his arrest, Franco told Trejo he was not worried about the charges because Arbasia "was still working for him" and was going to testify that Franco had not been

involved. Under cross-examination, Arbaisa admitted that he told police that Franco provided him with the drugs he sold to Valentine in Virginia. From this evidence the jury could conclude: that Franco provided cocaine to Arbaisa; that Arbaisa was "working for him"; that Franco knew Arbaisa was going to sell the cocaine; and that Franco promoted and cooperated in the venture by driving Arbaisa to Virginia and by acting as a lookout. In short, the jury could conclude that there was an agreement between Franco and Arbaisa to "'commit an offense'" by "'some concerted action.'" Edwards v. Commonwealth, 18 Va. App. 45, 48, 441 S.E.2d 351, 353 (1994) (quoting Cartwright v. Commonwealth, 223 Va. 368, 372, 288 S.E.2d 491, 493 (1982)). The requisite agreements, therefore, were proved by circumstantial evidence. Gray, 260 Va. at 680, 537 S.E.2d at 865. Indeed, the nature of conspiracy often mandates that the agreements be proved by indirect or circumstantial evidence. Id. A "common purpose and plan may be inferred from a development and collocation of circumstances." Combs v. Commonwealth, 30 Va. App. 778, 787, 520 S.E.2d 388, 392-93 (1999) (citation omitted).

Franco contends that this Court's decisions in Hudak v. Commonwealth, 19 Va. App. 260, 450 S.E.2d 769 (1994), and Feigley v. Commonwealth, 16 Va. App. 717, 432 S.E.2d 520 (1993), mandate that his convictions be reversed. We find, however, that these cases are readily distinguishable.

In Hudak, the evidence showed several illegal drug transactions between the buyer and the defendant-seller, but there was no proof the defendant knew the buyer intended to resell the drugs. Hudak, 19 Va. App. at 262, 450 S.E.2d at 771. Likewise, in Feigley, we noted that no evidence established that Feigley knew the cocaine he sold to an acquaintance would be redistributed. Feigley, 16 Va. App. at 723, 432 S.E.2d at 524. Significantly, in both cases we suggested the outcome may have been different had some evidence showed that the drugs were sold on credit whereby the seller would have retained a "vested interest" in the resale. Hudak, 19

- 10 -

Va. App. at 263, 450 S.E.2d at 771; Feigley, 16 Va. App. at 723, 432 S.E.2d at 524. As noted above, unlike the evidence in Hudak and Feigley, the evidence here established that Franco knew the cocaine he sold to Bonilla was being redistributed and that he retained an interest in the resale. Furthermore, Franco's knowledge of the intended redistribution of the drugs he supplied was proved by other evidence in the case. Manchester, a cocaine user, testified that Franco gave him "user amounts" of a gram, worth about $50 each. The quantities involved in the deals with Valentine were for one or two ounces at a cost of approximately $1,000 per ounce. Manchester's testimony, therefore, is evidence from which the jury could infer Franco knew the greater amounts supplied for the transactions with Valentine were for resale. Furthermore, Fuentes testified about one instance when he returned cocaine to Franco because Fuentes's purchaser complained about its quality. In response, Franco agreed to replace the poor quality cocaine with something better. From this evidence, the jury could conclude that Franco knew the cocaine he was providing was being redistributed.

### III. Conclusion

In conclusion, we find that sufficient evidence supports the jury's determination that Franco was guilty of distribution of cocaine and conspiracy to distribute cocaine. Accordingly, we affirm Franco's convictions.

Affirmed.