COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, O'Brien and Fulton
Argued at Alexandria, Virginia


BHAGAVAN KEVIN ANTLE

v.      Record No. 1906-23-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
FEBRUARY 4, 2025


FROM THE CIRCUIT COURT OF FREDERICK COUNTY
Alexander R. Iden, Judge

John H. Elledge, III (John Elledge & Associates, PC, on briefs), for
appellant.

Aaron J. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Frederick County convicted Bhagavan Kevin

Antle of two counts of purchasing an endangered species and two counts of conspiracy to sell or

purchase an endangered species.  On appeal, Antle argues that the circuit court misconstrued

Code § 29.1-564 in convicting him of *purchasing* an endangered species because that statute

prohibits the *sale* of an endangered species but not the *purchase* of an endangered species.  He

also argues that, by operation of Wharton's Rule,[1] the circuit court erred in convicting him of

"conspiracy to purchase an endangered species" because only he and the seller were involved in

the transactions.

---

[1] In defining Wharton's Rule, the Supreme Court has stated that "Wharton's Rule applies
when the conspiracy alleged involves the same persons who would have been involved in the
cooperative conduct which would support a violation of the substantive crime." *Commonwealth
v. Richard*, 300 Va. 382, 389 (2021).

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

### A. The Lion Cub Transactions

"Doc" Antle is the owner of the Myrtle Beach Safari Park in South Carolina, where paying guests can pet and take photographs with baby animals. Keith Wilson, the former owner of Wilson's Wild Animal Park in Frederick County, Virginia, testified at Antle's jury trial that he first met Antle "in the early 1980's" and that their relationship "was always a friendly nature." Wilson recounted that between 2015 and 2019, he sold a number of exotic animals to Antle over this period of time, in particular "[l]ion cubs." As of December 23, 2015, however, African lions were listed on the Federal Endangered and Threatened Species List, which Wilson explained meant that "you can't sell it across state lines."[2] Wilson, who was located in Virginia, nevertheless continued to sell lion cubs to Antle, who was located in South Carolina, after 2016.

Wilson described the nature of his agreement with Antle to buy and sell lion cubs, stating, "It started out that he was to take every cub that I raised. It didn't matter the time of year or the sex of them. But he was to buy every cub at the price of $2,500 each." Wilson later

---

[2] *See* 16 U.S.C. §§ 1531 through 1544; 50 C.F.R. § 17.40(r). Virginia's version of the Endangered Species Act (Code §§ 29.1-563 through 29.1-570) applies to all species listed on the Federal Endangered and Threatened Species List, including African lions. *See* 4 VAC 15-20-130 (adopting the Federal Endangered and Threatened Species List and providing additional protections for certain other endangered species within Virginia).

increased the price to "$3,000 per cub." He then described the process by which Antle would purchase the lion cubs from him, stating:

> [W]hen I would have a cub, you know, a litter born, I would call or text him and say, you know, she had two cubs, she had three cubs, and you know they should be ready in a couple of weeks and when we would get them separated from the mother I would call and he would send, you know, transportation to pick them up.

Wilson acknowledged that he did not have any federal permit to sell the lion cubs to Antle across state lines.[3] Describing the process by which Antle would pay for the lion cubs, Wilson noted that "[s]ometimes it would be by check."[4]

Wilson recalled that after three lion cubs were born on July 14, 2017, he notified Antle, who then arranged to transport the lion cubs from Virginia to South Carolina. He explained that he would typically separate the lion cubs from their mother "around two weeks"—as Antle "always wanted them as young as possible" and "would take them, you know, as quick as you could get them to him."[5] He also recalled that "a lady I didn't know" later came to pick up the lion cubs in Virginia after they were born and transport them to South Carolina.

---

[3] Dr. Mary Cogliano, a Fish and Wildlife Service Administrator and Branch Manager with the U.S. Department of the Interior Fish and Wildlife Service, testified at trial as the agency's custodian of records for the Branch of Permits. She explained that "[u]nder the Endangered Species Act a captive-bred wildlife registration or an Interstate Commerce permit would be required" to buy captive-bred endangered or threatened wildlife across state lines—and that she was responsible for reviewing those registration and permit applications. She stated that between January 1, 2016, and June 30, 2022, there were no records that Antle or any of his entities in South Carolina had an Interstate Commerce permit or a captive-bred wildlife registration.

[4] At trial, the Commonwealth introduced into evidence a check dated June 15, 2015—in the amount of $7,500 made out to Wilson's Wild Animal Park "from Preservation Station, Incorporated doing business as the Rare Species Fund"—for one of the earlier transactions involving lion cubs (before they were added to the Federal Endangered and Threatened Species List). The memo line of the check stated, "Lions," which Wilson clarified meant "lion cubs." Wilson testified that Rare Species Fund is "Antle's place in Myrtle Beach."

[5] Dr. Felicia Knightly, a Doctor of Veterinary Medicine, testified at trial as an expert in veterinary medicine and in the care and husbandry of lions. She explained that lion cubs in

At issue in this case, Wilson went on to recount that two more lion cubs were born on May 7, 2018—which Antle purchased by making a March 29, 2018 prepayment via PayPal in the amount of $5,000, with the memo line stating, "RareSpeciesFund.org supports your vision for new tiger habitat." Wilson confirmed that the $5,000 "was prepayment for two lion cubs." When asked why Antle's payment for the lion cubs was styled as a donation, Wilson stated, "I had sent him a text saying that I had lion cubs that were due and that this might be a good time for him to make a donation in anticipation of the lion cubs." Wilson noted that the money from Antle was labeled as a donation rather than as a payment "[b]ecause it was illegal to sell lion cubs. It would have been legal to make a donation." Antle arranged to have the lion cubs picked up and transported to South Carolina, and he told Wilson "[j]ust that they had a lot of tourists and they needed lion cubs."

In December 2018, Antle sent Wilson "a male lion" and "$2,000 in cash." Wilson recalled that his male lion had died and that he had "needed a new male to put with the female so that she wouldn't be alone and also to produce cubs." He noted that the $2,000 from Antle was for "whatever care that cat needed so it would survive." He also explained that "[w]hatever wasn't used for the medical treatment would come off of the cubs in the future," and he confirmed that the $2,000 from Antle was later applied to the purchase price of other lion cubs.

Wilson then recounted that three more lion cubs were born on July 12, 2019. After notifying Antle, Wilson was then paid $3,000 by Antle for each lion cub. Wilson recalled that

captivity should stay with their mother "[f]or at least a year." She also explained that, according to U.S. Department of Agriculture standards, lion "cubs should not be handled under 25 days of age unless absolutely necessary." Dr. Knightly emphasized that the only two circumstances in which it is necessary to take a lion cub away from its mother is "if the mother is showing clear signs of neglect" or "if the cubs had an issue." She stressed that separating a lion cub from its mother within the first 25 days of the cub's life can be detrimental to the cub's development, "can definitely cause stress between the lioness and the cubs," can disrupt the bond between the cub and its mother, and can cause the cub later to interact inappropriately with other lions.

Antle had told him that "they had a lot of tourists. He needed lion cubs to, you know, help with his business and to extract money from tourists." To separate these lion cubs from their mother, Wilson detailed that he would withhold water from the mother to lure the lioness to move to a different part of the enclosure in order to drink water placed there and that once "she left the cubs we would go in and grab the cubs from her." He stated that he told Antle about his practice of separating the lion cubs at an early age from their mother.

Antle quickly arranged for the transport of the three lion cubs, and Wilson recalled that Antle's daughter, Tilakam Watterson, picked up two of the lion cubs in Virginia to transport them to South Carolina. Wilson also recalled that Antle's other daughter, Tawny Antle, soon thereafter picked up the third lion cub to transport it from Virginia to South Carolina. Wilson noted that because an inspector from the U.S. Department of Agriculture was at his facility on the day that Tawny Antle came to get the third lion cub, he texted Antle "for him to message her and tell her to get in, get the cub, and leave." Wilson acknowledged, "I was hiding the cub. I had it in my office and I just didn't want to bring another element into an inspection." He also acknowledged that on two written forms that he created for the purpose of recording the sale of the three lion cubs to Antle, he "marked it as a donation when it was not a donation"—and he also put an earlier birth date on the forms for the cubs than when they were actually born "[t]o make them appear older" in order to comply with certain USDA regulations.

B. The Animal Abuse Investigation

Special Agent Joseph Williams of the Virginia State Police testified that on August 15, 2019, as part of an animal abuse investigation into Wilson, the police executed a search warrant at Wilson's Wild Animal Park and seized a cell phone from Wilson. Sergeant Erin Brogan of the Shenandoah County Sheriff's Office testified that a lion and a lioness were also seized from Wilson's Wild Animal Park following the execution of that search warrant. Sergeant Brogan

noted that evidence collected from Wilson's cell phone prompted her and Investigator Amy Taylor of the Office of the Attorney General of Virginia to visit Antle's Myrtle Beach Safari Park as part of the animal abuse investigation.

Sergeant Brogan testified that in November 2019, she and Investigator Taylor "paid the general admission fees" of "[a]pproximately $1,700" to visit Antle's Myrtle Beach Safari Park, where they "were able to pet the small animals" and "take pictures" with the animals.[6] She recounted, "There were tigers. There was one liger, one lion, there were monkeys. There was an area that you could go and they brought out wolves, baby animals that you could pet and they were, we were video taped and photographed with the animals." Sergeant Brogan emphasized that the animals "were really small. They were significantly younger than I would have expected to see there. Some of them were just very tiny and the handlers would take bottles out of like a satchel and occasionally feed the animals as they were bringing them around to people to pet and play with."

Sergeant Brogan then testified that after she and Investigator Taylor visited Antle's Myrtle Beach Safari Park, "[w]e took the names that we had learned and what people had identified themselves that work at the Park and we started doing some research into the people that work at the Park and the animals that we saw to see if any of them were linked to the Wilson's Wild Animal Park case." She recalled that Antle was present during their visit and that

---

[6] Sergeant Brogan described the process of visiting Antle's zoo. She stated that after paying the admission fees, "[t]hey send you an email confirmation and then it tells you a location that you need to go to. You go to that location and it tells you to wait outside for staff to come out and get you." She recounted that once they got to Antle's zoo, "[w]e went down the driveway to the address that we were given. We were told to wait outside the gate. Some workers came out. There were some little tiki huts out that had some restrooms in there and you had to sign the waiver and then you were given instructions to go into" the zoo. She noted, "You weren't allowed to bring anything into the Park with you, that included your cell phone. Everything had to stay in your vehicle. You also were instructed to park a specific way with your license plates showing a specific way as well and then you were taken into a room where you showed your ID and [were] given your ticket."

"[h]e rode in on an elephant." She further recalled that Antle's two daughters, Tilakam Watterson and Tawny Antle, were also present during their visit.

Law enforcement in South Carolina subsequently obtained a search warrant for Antle's Myrtle Beach Safari Park and then executed that search warrant on December 11, 2019. Lieutenant Stephen Howell of the South Carolina Law Enforcement Division testified that the police seized certain "[i]tems such as computers, portable hard drives, thumb drives, media, phones, that sort of thing" from Antle's zoo, and also obtained DNA samples from several lion cubs at Antle's zoo.[7] Lieutenant Casey Collier of the South Carolina Law Enforcement Division testified that the police also seized a cell phone from Antle, and she recalled that Antle made several statements to the police "about the three cubs that were picked up" from "Virginia. From a Mr. Keith." She further recalled that Antle specifically "mentioned Wilson's Wild Animal Park."[8]

C. Antle's Indictments

On October 8, 2020, a Frederick County grand jury returned an indictment charging that:

> On or about May 25, 2018, BHAGAVAN ANTLE did unlawfully
> and feloniously purchase or offer to purchase within the
> Commonwealth any fish or wildlife (to wit: two lion cubs)
> appearing on any list of threatened or endangered species
> published by the United States Secretary of the Interior pursuant to
> the provisions of the federal Endangered Species Act of 1973 (P.L.
> 93-205), or any modifications or amendments thereto, and the
> aggregate of such sales totaled $200 or more during any 90-day

---

[7] Special Agent Dalila Cirencione of the South Carolina Law Enforcement Division testified that Dr. Ernesto Dominguez, a veterinarian from Virginia, collected DNA samples in the form of buccal swabs from five lion cubs at Antle's zoo.

[8] Video footage from Lieutenant Collier's body-worn camera on the date of the execution of the search warrant was introduced into evidence at trial. One video showed Antle's interaction with the police during the execution of the search warrant, including his statement, "I have the three lions that came from Keith's." Another video showed Dr. Dominguez obtaining a DNA sample from a caged lion cub at Antle's zoo.

period in violation of Section 29.1-564 and Section 29.1-567 of the Code of Virginia (1950) as amended.

That grand jury also returned an indictment charging that:

On or about May 25, 2018, BHAGAVAN ANTLE did unlawfully and feloniously conspire with Keith Wilson to sell, offer for sale, purchase, or offer to purchase within the Commonwealth any fish or wildlife (to wit: two lion cubs) appearing on any list of threatened or endangered species published by the United States Secretary of the Interior pursuant to the provisions of the federal Endangered Species Act of 1973 (P.L. 93-205), or any modifications or amendments thereto, and the aggregate of such sales totaled $200 or more during any 90-day period in violation of Section 29.1-564 and Section 29.1-567 of the Code of Virginia (1950) as amended and one or more of such persons did an act to effect the object of the conspiracy (to wit: sell, offer for sale, purchase, or offer to purchase two lion cubs) in violation of Section 29.1-505.1 of the Code of Virginia (1950) as amended.

In addition, on June 9, 2022, a Frederick County grand jury returned an indictment charging that:

On or about July 26, 2019 or August 6, 2019, BHAGAVAN ANTLE did unlawfully and feloniously purchase or offer to purchase within the Commonwealth any fish or wildlife (to wit: three lion cubs) appearing on any list of threatened or endangered species published by the United States Secretary of the Interior pursuant to the provisions of the federal Endangered Species Act of 1973 (P.L. 93-205), or any modifications or amendments thereto, and without the required federal permit and the aggregate of such sales totaled $500 or more during any 90-day period in violation of Section 29.1-564 and Section 29.1-567 of the Code of Virginia (1950) as amended.

That grand jury also returned an indictment charging that:

On or about July 26, 2019 or August 6, 2019, BHAGAVAN ANTLE did unlawfully and feloniously conspire with Keith Wilson to sell, offer for sale, purchase, or offer to purchase within the Commonwealth any fish or wildlife (to wit: three lion cubs) appearing on any list of threatened or endangered species published by the United States Secretary of the Interior pursuant to the provisions of the federal Endangered Species Act of 1973 (P.L. 93-205), or any modifications or amendments thereto, and without the required federal permit and the aggregate of such sales totaled $500 or more during any 90-day period in violation of Section 29.1-564 and Section 29.1-567 of the Code of Virginia (1950) as amended and one or more of such persons did an act to effect the

object of the conspiracy (to wit: sell, offer for sale, purchase, or
offer to purchase three lion cubs) in violation of Section 29.1-505.1
of the Code of Virginia (1950) as amended.

In sum, Antle was charged with two counts of purchasing an endangered species, in violation of Code §§ 29.1-564 and 29.1-567, and two counts of conspiracy to sell or purchase an endangered species, in violation of Code §§ 29.1-505.1, 29.1-564, and 29.1-567.[9]

### D. Antle's Motion to Strike and Renewed Motion to Strike

At the conclusion of the Commonwealth's case-in-chief, Antle's defense counsel moved to strike the charges. On the charges of purchasing an endangered species, Antle's defense counsel argued that, although Antle's indictments include the words "purchase or offer to purchase," Code § 29.1-564 instead prohibits "the sale or offer for sale within the Commonwealth of any wildlife appearing on . . . any list of endangered species published by the United States Secretary of the Interior." His defense counsel also argued that Code § 29.1-567 "is a penalty section" and that a violation of Code § 29.1-564, which contains "the elements of the offense," is "a condition precedent before you do anything with" Code § 29.1-567. On the charges of conspiracy to sell or purchase an endangered species, Antle's defense counsel contended that "there is no evidence whatsoever that Mr. Antle and Mr. Wilson are on the same side of the transaction," and "[y]ou cannot have a conspiracy when there is a buyer/seller arrangement . . . because they don't share the same intent." His defense counsel also contended that the third-party exception to Wharton's Rule is inapplicable in this case because "[t]here is no evidence that there is a third party to the agreement" between Antle and Wilson.

After taking Antle's motion to strike under advisement, the circuit court subsequently denied Antle's motion to strike the charges of purchasing an endangered species and conspiracy to

---

[9] Antle was also charged with nine counts of animal cruelty. However, four of those counts were dismissed on the circuit court's granting of Antle's motion to strike those charges, and the jury found Antle not guilty on the remaining five counts.

sell or purchase an endangered species. On the charges of purchasing an endangered species, the circuit court judge found that "Virginia Code Sections 29.1-564 and 567 are *in pari materia* and must be read together."[10] The circuit court noted that, "when read together, the element that makes these offenses felonies, is the sale, offering for sale, purchasing or offering to purchase within the Commonwealth of any fish or wildlife appearing on a list of threatened or endangered species." On the charges of conspiracy to sell or purchase an endangered species, the circuit court judge found that the third-party exception to Wharton's Rule applies because "these transactions involved either Mr. Antle's daughters or other cub transporters." The circuit court opined that "[t]he rational[e] supporting this exception is that the addition of a third party enhances the dangers presented by the crime and thus invokes the policy concerns addressed by the law of conspiracy."

Antle did not present witness testimony in his defense, and his defense counsel renewed the motion to strike, noting that "the legal arguments would be the same." Antle's defense counsel asserted that "[t]here has been no evidence whatsoever of financial transactions in 2019" aside from "the delivery of a male lion to Mr. Wilson" and that "some advanced payment understanding agreement individually in Mr. Wilson's mind, just doesn't rise to the level of sufficiency of the evidence." His defense counsel also asserted that "the math does not add up" regarding Antle's "$5,000 donation" to Wilson and the "two cubs that get transferred" from Wilson to Antle in 2018.

After hearing argument, the circuit court judge found that, "as to the no payment in 2019, the Court believes that the evidence is, that reasonable minds could differ, as to this point. It is a

---

[10] The phrase "*in pari materia*" is defined as "[o]n the same subject; relating to the same matter." *In Pari Materia, Black's Law Dictionary* (12th ed. 2024) ("It is a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject.").

jury issue that is inappropriate, even at this stage of the [m]otion to strike." The circuit court concluded that, "ultimately, all of the things remaining, all of the information, all of the arguments remaining, go to the weight and, and the Court finds that reasonable minds could differ. And so for that reason the Court denies the renewed [m]otion to strike."

### E. The Jury Instructions on the Conspiracy Charges

At trial, Antle's defense counsel proffered two jury instructions related to the charges of conspiracy to sell or purchase an endangered species. First, Defense Instruction Q—which was based on 1 Virginia Model Jury Instructions – Criminal, No. 14.100 (2022)—stated:

> The defendant Mr. Antle is charged with conspiracy to sell or to offer to sell endangered species.
>
> The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> > (1) The defendant entered into an agreement with one or more other persons;
> >
> > (2) The agreement was that they were to commit the offense of selling endangered species; and
> >
> > (3) Both the defendant and at least one other party to the agreement intended to commit the offense of selling endangered species.
>
> If you find from the evidence the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty.
>
> If you find the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the crime, then you shall find the defendant not guilty.

The attorney for the Commonwealth asked the circuit court to add the words "purchasing or offering to purchase" to that proposed jury instruction to match the language in Antle's conspiracy indictments. In response to the circuit court agreeing to make the Commonwealth's requested modification, Antle's defense counsel stated that "we would object to your modifications to Defense

- 11 -

Instruction Q based on the legal grounds we have already argued" in the motion to strike, "[b]ut we understand Your Honor's ruling on the law and based only on that ruling we understand the modifications to the elements of the offense as set forth." Antle's defense counsel then asked the circuit court "to modify Defense Instruction Q to say the Defendant entered into an agreement with Keith Wilson because that is what is charged in the indictment." Without objection from the attorney for the Commonwealth, the circuit court agreed to make defense counsel's requested modification. The circuit court subsequently gave the jury Instruction Number 7, which stated:

> The defendant is charged with conspiracy to purchase or offer to purchase an endangered species.
>
> The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (l)     The defendant entered into an agreement with Keith Wilson;
>
> (2)     The agreement was that they were to commit the offense of selling or purchasing or offering to purchase an endangered species; and
>
> (3)     Both the defendant and at least one other party to the agreement intended to commit the offense of selling or purchasing or offering to purchase endangered species.
>
> If you find from the evidence the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty.
>
> If you find the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the crime, then you shall find the defendant not guilty.

Second, Defense Instruction R—which was based on 1 Virginia Model Jury Instructions – Criminal, No. 14.220 (2022)—stated: "A conspiracy cannot exist unless criminal intent is shared by at least two people." With the agreement of the parties, the circuit court gave that exact proposed instruction to the jury as Instruction Number 14.

- 12 -

After hearing the evidence and argument, the jury subsequently found Antle guilty of two felony counts of "the purchase or sale of an endangered species," in violation of Code §§ 29.1-564 and 29.1-567, and two felony counts of "conspiring to sell or purchase an endangered species," in violation of Code §§ 29.1-505.1, 29.1-564, and 29.1-567.

### F. Antle's Motion to Set Aside the Jury Verdict

Antle's defense counsel then moved the circuit court to set aside the jury's verdict. On the offense of purchasing an endangered species, counsel for Antle argued that the plain language of Code § 29.1-564 (which is one of the two statutes referenced in Antle's indictments on that offense) prohibits "only the 'taking, transportation, possession, *sale or offer for sale* [of endangered species] within the Commonwealth'"—and that Code § 29.1-564 "is devoid of the language 'purchase or offer to purchase.'" Counsel for Antle further argued that Code § 29.1-567 (the other statute referenced in Antle's indictments on that offense) "does not prohibit any specific conduct," but rather provides "*penalties* applicable to conduct criminalized by" Code § 29.1-564. Asserting that "a purchase or offer to purchase an endangered species cannot serve as the predicate offense because it is not 'prohibited by [Code] § 29.1-564,'" counsel for Antle maintained that "the General Assembly certainly would have and could have included the words 'offer to purchase or purchase' if it had intended to do so" in the substantive offense.[11]

On the offense of conspiracy to sell or purchase an endangered species, Antle's defense counsel contended that "the Commonwealth failed to prove the conspiracy involved more than merely a buyer-seller relationship, which cannot, as a matter of law, support convictions for conspiracy involving a sale between the parties." Counsel for Antle argued that "[u]nder

---

[11] In the alternative, Antle's defense counsel argued that, even if the statutory scheme did "cover Mr. Antle's role in the exchange of these animals, the evidence was insufficient as a matter of law to show that Mr. Antle and Mr. Wilson shared a common intent to violate the law, or that Mr. Wilson received anything of value in exchange for the lion cubs charged in each of the counts."

Wharton's Rule, and the circumstances here, there are only two parties, a buyer and a seller, to this transaction, and the substantive offense merges into the conspiracy charge." Counsel for Antle also argued that the third-party exception to Wharton's Rule does not apply here because "[t]he Commonwealth did not allege and never offered any proof that either of Mr. Antle's daughters had actual knowledge of the alleged agreement or any knowledge of a sale or purchase between Mr. Antle and Mr. Wilson." In addition, Antle's defense counsel asserted that "the Commonwealth failed to present any evidence that Mr. Antle and Mr. Wilson entered into an actual agreement with shared intent, namely, to *sell* a lion cub."

After hearing argument and taking Antle's motion to set aside the jury verdict under advisement, the circuit court subsequently denied Antle's motion. In a letter opinion dated October 3, 2023, the circuit court found that "[t]he relevant statutes, read together" *in pari materia*, "prohibit and punish as a felony, the purchase of endangered species." The circuit court also concluded that, "through application of the third party exception, conviction of the conspiracy charges is not precluded by Wharton's Rule." Finding that "[t]he third party exception applies in these cases," the circuit court stated:

> Antle and Wilson were not the only actors who participated in the commission of the substantive offenses. For the 2018 sale, Wilson testified that Antle did not personally pick up the lion cubs but arranged their transport to Antle's park in South Carolina by a third party. For the 2019 sale, Wilson testified that two of the lion cubs were transported to Antle's park in South Carolina by Antle's daughter, Tilakam Watterson, and the third lion cub was transported to Antle's park in South Carolina a short time later by Antle's daughter, Tawny Antle.

By final sentencing order entered on November 2, 2023, the circuit court sentenced Antle to two years of incarceration for each offense (to be served concurrently with the other two-year sentences)—with those sentences all suspended, conditioned upon five years of good behavior. The circuit court also imposed a total fine of $10,000 and ordered that Antle "shall not work,

- 14 -

own, possess, broker, buy, sell, trade, transfer, barter, or donate any nonnative (exotic) animal listed in the attached document [to the final sentencing order] or any non-human primate." Antle now appeals to this Court.

## II. ANALYSIS

### A. Purchasing or Offering to Purchase an Endangered Species

On appeal, Antle assigns three errors related to his convictions for purchasing an endangered species. First, Antle argues that the circuit court "erred in denying Appellant's Motion to Strike all charges related to violations of . . . Code . . . § 29.1-564 because Virginia law does not prohibit the purchase of endangered species under [Code] § 29.1-564 or [Code] § 29.1-567." Second, he argues that the circuit court "erred when it interpreted [Code] § 29.1-564 and [Code] § 29.1- 567 by applying *in pari materia* to read those sections together to create a criminal offense for the purchase of endangered species that did not exist in the plain language of the statutes." Finally, he contends that the circuit court "erred in denying Appellant's Motion to Set Aside the Verdict on charges related to the purchase of an endangered species because Virginia law does not prohibit such conduct."

It is well established that "[a] penal statute must be strictly construed and may not be extended by implication." *Greene v. Commonwealth*, 277 Va. 408, 410 (2009). Furthermore, penal statutes "must be applied to cases clearly described by the language used" actually in the statute, and "the accused is entitled to the benefit of any reasonable doubt about the construction of a penal statute." *Fullwood v. Commonwealth*, 279 Va. 531, 536 (2010). However, "[w]hile it is true that penal statutes must be strictly construed against the Commonwealth in criminal cases, we will not apply an unreasonably restrictive interpretation of the statute that would subvert the legislative intent expressed therein." *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (quoting *Alger v. Commonwealth*, 267 Va. 255, 259 (2004)). Indeed, we "must presume that the

General Assembly chose, with care, the words that appear in a statute, and must apply the statute in a manner faithful to that choice." *Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (quoting *Johnson v. Commonwealth*, 292 Va. 738, 742 (2016)). In addition, "every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Robinson v. Commonwealth*, 274 Va. 45, 51-52 (2007) (quoting *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340 (1998)). "Statutory interpretation is a question of law which we review de novo." *Wright v. Commonwealth*, 278 Va. 754, 759 (2009).

"[A] crime is made up of two parts, forbidden conduct and a prescribed penalty. The former without the latter is no crime." *Cook v. Commonwealth*, 20 Va. App. 510, 513 (1995) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 1.2(d) (1986)); *see also United States v. Evans*, 333 U.S. 483, 486 (1948). "If a criminal statute or ordinance does not specify a penalty, it is beyond our province to prescribe one on the assumption that the deficiency was simply an 'oversight.'" *Id.* It follows that "[c]ourts do not have the power to prescribe conduct as criminal where the legislature has not specified by statute that the conduct is criminal." *Parker v. Commonwealth*, 42 Va. App. 358, 391 (2004) (Benton, J., dissenting). Indeed, "[d]efining crimes and fixing penalties are legislative, not judicial, functions." *Cook*, 20 Va. App. at 513 (quoting *Evans*, 333 U.S. at 486).

Virginia law governs the conservation and management of endangered and threatened species of fish and wildlife in Virginia. *See* Code §§ 29.1-563 through -570. Relevant to this appeal, Code § 29.1-564 provides:

> The taking, transportation, possession, sale, or offer for sale within the Commonwealth of any fish or wildlife appearing on any list of threatened or endangered species published by the United States Secretary of the Interior pursuant to the provisions of the federal Endangered Species Act of 1973 (P.L. 93-205), or any modifications or amendments thereto, is prohibited except as provided in [Code] § 29.1-568.

Conspicuously absent from the substantive offense of Code § 29.1-564, however, are the words "purchase" or "offer to purchase" an endangered species.[12] Code § 29.1-567(A), in conjunction with Code § 29.1-553(A),[13] penalizes violations of Code § 29.1-564, providing:

> Any person who violates the provisions of [Code] § 29.1-564 or [Code] § 29.1-566, or any regulations issued pursuant to these sections, or whoever violates any regulation or permit issued under [Code] § 29.1-568 shall be guilty of a Class 1 misdemeanor; however, the sale, offering for sale, purchasing or offering to purchase within the Commonwealth of any fish or wildlife appearing on a list of threatened or endangered species as prohibited by [Code] § 29.1-564 shall be punishable as provided in [Code] § 29.1-553.

Unlike the substantive offense of Code § 29.1-564, the penalty provisions of Code § 29.1-567(A) do, in fact, contain the words "purchasing or offering to purchase."

Code § 29.1-564 was enacted in 1972 as Code § 29-232. Code § 29.1-567(A) was likewise enacted in 1972 as Code § 29-235, and it set the penalty for "violat[ing] the provisions of [Code] § 29-232." Those statutes were then recodified in 1987 as Code § 29.1-564 and Code

---

[12] The comparable federal statute, 16 U.S.C. § 1538(a)(1)(A)-(F), makes it unlawful to "import," "take," "possess," "sell," "offer for sale," "deliver," "carry," "transport," or "ship" an endangered species. That federal statute, like Code § 29.1-564, does not expressly prohibit the "purchase" of or the "offer to purchase" an endangered species.

[13] Code § 29.1-553(A), in turn, provides:

> Any person who offers for sale, sells, offers to purchase, or purchases any wild bird or wild animal, or any part thereof, or any freshwater fish, except as provided by law, shall be guilty of a Class 1 misdemeanor. However, when the aggregate of such sales or purchases, or any combination thereof, by any person totals $1,000 or more during any 90-day period, that person shall be guilty of a Class 6 felony.

The authorized punishment for conviction of a Class 1 misdemeanor is "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Code § 18.2-8(a). The authorized punishment for conviction of a Class 6 felony is "a term of imprisonment of not less than one year nor more than five years, or in the discretion of the jury or the court trying the case without a jury, confinement in jail for not more than 12 months and a fine of not more than $2,500, either or both." Code § 18.2-10(f).

§ 29.1-567(A), respectively.  *See* 1987 Va. Acts ch. 488.  In 1994, the General Assembly amended Code § 29.1-567(A) to add language pertaining to "purchasing or offering to purchase" an endangered species to correspond with existing provisions addressing wild birds and wild animals (Code § 29.1-521(A)(11)), game fish (Code § 29.1-531(E)), and migratory birds (Code § 29.2-547).  *See* 1994 Va. Acts chs. 436, 848.  However, the General Assembly did not amend Code § 29.1-564 to include "purchasing or offering to purchase."

In this case, Antle was charged with two counts of "purchas[ing] or offer[ing] to purchase within the Commonwealth" endangered lion cubs, in violation of Code §§ 29.1-564 and 29.1-567.  It is clear from the plain and precise words contained in Code § 29.1-564 that the substantive offense simply does not include the *purchase* of or the *offer to purchase* an endangered species and that the General Assembly chose not to include the *purchase* as a crime under that statute.  Thus, the maxim *expressio unius est exclusio alterius* is applicable here.  *See Turner v. Wexler*, 244 Va. 124, 127 (1992) ("This maxim provides that mention of a specific item in a statute implies that omitted items were not intended to be included within the scope of the statute.").  The Supreme Court has made clear that "when the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, [the Court] must presume that the difference in the choice of language was intentional."  *Morgan v. Commonwealth*, 301 Va. 476, 482 (2022) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)); *accord Rives v. Commonwealth*, 284 Va. 1, 3 (2012)).  "Courts must rely on this presumption 'because under these circumstances, it is evident that the General Assembly "knows how" to include such language in a statute to achieve an intended objective,' and therefore, omission of such language in another statute 'represents an unambiguous manifestation of a contrary intention.'"  *Id.* (quoting *Brown v. Commonwealth*, 284 Va. 538, 545 (2012)).

Antle's indictments, however, charged him with violating both Code § 29.1-564 and Code § 29.1-567. The circuit court found that considering those statutes *in pari materia* established the substantive offense of purchasing or offering to purchase an endangered species. The Supreme Court has explained that "statutes may be considered as *in pari materia* when they relate to the same person or thing, the same class of persons or things or to the same subject or to closely connected subjects or objects." *Lucy v. Cnty. of Albemarle*, 258 Va. 118, 129 (1999) (quoting *Prillaman v. Commonwealth*, 199 Va. 401, 405 (1957)). In other words, statutes that "have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." *Id.* (quoting *Prillaman*, 199 Va. at 405). Under this canon of construction, "statutes are considered as if they constituted but one act, so that sections of one act may be considered as though they were parts of the other act, as far as this can reasonably be done." *Morgan*, 301 Va. at 481 (quoting *Prillaman*, 199 Va. at 405). Furthermore,

> where legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it, and they should be so construed as to harmonize the general tenor or purport of the system and make the scheme consistent in all its parts and uniform in its operation, unless a different purpose is shown plainly or with irresistible clearness.

*Id.* (quoting *Prillaman*, 199 Va. at 405).

However, the Supreme Court has repeatedly stated that a "penal statute cannot be extended by implication or construction. It cannot be made to embrace cases not within the letter though within the reason and policy of the law." *Robinson*, 274 Va. at 52 (quoting *McKay v. Commonwealth*, 137 Va. 826, 830 (1923)). "To constitute the offense the [defendant's conduct] must be both within the letter and spirit of the statute defining it. Those who contend that a

- 19 -

penalty is imposed must show that the words of the act distinctly cover the case." *Id.* (quoting

*McKay*, 137 Va. at 830). Thus, "[t]he question here is not what the legislature intended to enact,

but what is the meaning of that which it did enact. We must determine the legislative intent by

what the statute says and not by what we think it should have said." *Turner*, 244 Va. at 127

(quoting *Carter v. Nelms*, 204 Va. 338, 346 (1963)).

       In short, by not including the words "purchase or offer to purchase" in Code § 29.1-564,

the General Assembly simply did not make purchasing or offering to purchase an endangered

species a criminal offense. *See id.* Because Code § 29.1-564 does not prohibit purchasing or

offering to purchase an endangered species, Antle was convicted of an offense that is not actually

a crime, as he was indicted, under Code § 29.1-564. *Cf. Cook*, 20 Va. App. at 513. Antle clearly

engaged in the reprehensible act of purchasing extremely young, endangered lion cubs that had

been forcibly separated from their mother mere weeks after their birth—which was undoubtedly

not in the best interest of those endangered and very young animals. However, Antle's specific

conduct of purchasing young cubs of an endangered species is simply not criminalized by the

plain language of Code § 29.1-564, under which he was indicted. Consequently, Antle's

convictions for purchasing an endangered species must be reversed.[14] *See generally Masika v.*

*Commonwealth*, 63 Va. App. 330, 340-41 (2014).

---

[14] It is well settled that if there is "any defect in form in any indictment, presentment or information, or if there shall appear to be any variance between the allegations therein and the evidence offered in proof thereof," the attorney for the Commonwealth may move the circuit court to amend the indictment "at any time before the jury returns a verdict or the court finds the accused guilty or not guilty, provided the amendment does not change the nature or character of the offense charged." Code § 19.2-231. However, the attorney for the Commonwealth in this case elected not to do so, and consequently, Antle was not ever charged with *possession* of the lion cubs (or with *transportation* of them) but only with *purchasing* the lion cubs (or offering to purchase them).

B.  Conspiracy to Sell or Purchase an Endangered Species

Antle also assigns three errors related to his convictions for conspiracy to sell or purchase an endangered species.  First, Antle argues that the circuit court "erred in denying Appellant's Motion to Strike all conspiracy charges against Appellant because the buyer cannot conspire with the seller in a buy-sell transaction where no other parties participate in the purchase or sale."  Second, he argues that the circuit court "erred by improperly instructing the jury regarding the charges of conspiracy to purchase an endangered species considering the indictment and the parties involved in the transaction."  Finally, he contends that the circuit court "erred in denying Appellant's Motion to Set Aside the Verdict as to the conspiracy charges against Appellant considering the content of the indictment and the fact that Appellant was the buyer in a buy/sell transaction that involved only the buyer and seller."

*1.  Wharton's Rule and the Third-Party Exception*

"A criminal conspiracy is merely an agreement between two or more persons to commit a crime."  *Simpson v. Commonwealth*, 227 Va. 557, 567 (1984).  "Conspiracy 'requires knowledge of and voluntary participation in' the agreement to carry out the criminal act."  *Carr v. Commonwealth*, 69 Va. App. 106, 117 (2018) (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)).  "Mere participation in the crime is insufficient to prove conspiracy; '[t]he agreement is the essence of the conspiracy offense.'"  *Id.* at 118 (quoting *Zuniga*, 7 Va. App. at 527-28).  However, "[p]roof of an explicit agreement is not required and the requisite agreement may be established by circumstantial evidence."  *Jones v. Commonwealth*, 279 Va. 295, 301 (2010) (quoting *Gray v. Commonwealth*, 260 Va. 675, 680 (2000)).  Thus, when the evidence presented at trial establishes that two or more people "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to

- 21 -

effect that object." *Brown v. Commonwealth*, 10 Va. App. 73, 78 (1990) (quoting *Amato v. Commonwealth*, 3 Va. App. 544, 552 (1987)).

"Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." *Commonwealth v. Richard*, 300 Va. 382, 389 (2021) (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975)). Wharton's Rule, however, "is a judicially created 'doctrine of criminal law enunciating an exception to the general principle that a conspiracy and the substantive offense that is its immediate end are discrete crimes for which separate sanctions may be imposed."[15] *Schwartz v. Commonwealth*, 45 Va. App. 407, 444 (2005) (quoting *Iannelli*, 420 U.S. at 771). "Wharton's Rule precludes conviction for both the substantive offense and the conspiracy to commit that offense when the substantive offense 'is of such a nature as to *necessarily require* the participation of two persons for its commission.'" *Id.* (quoting *Iannelli*, 420 U.S. at 774 n.5). As noted *supra*, "Wharton's Rule applies where '[t]he parties to the agreement are the only persons who participate in the commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large.'" *Richard*, 300 Va. at 390 (quoting *Iannelli*, 420 U.S. at 782). "[A]bsent legislative intent to the contrary, [Wharton's] Rule supports a presumption that . . . [conspiracy and the substantive offense] merge when the substantive offense is proved." *Id.* (quoting *Stewart v. Commonwealth*, 225 Va. 473, 479 (1983)).

The Supreme Court has recognized a third-party exception to Wharton's Rule, stating:

> Under the "third-party exception" to [Wharton's] Rule a conspiracy charge may be brought where the agreement which is the basis for the conspiracy involved more participants than were necessary for the commission of the substantive offense. The rationale supporting this exception is that the addition of a third party enhances the dangers presented by the crime and thus invokes the policy concerns addressed by the law of conspiracy.

---

[15] "The doctrine takes its name from the influential criminal-law author, Francis Wharton (1820-1889)." *Wharton's Rule*, *Black's Law Dictionary*, *supra*.

*Id.* (quoting *Stewart*, 225 Va. at 479). In this case, the circuit court found that the third-party exception to Wharton's Rule applies because "Antle and Wilson were not the only actors who participated in the commission of the substantive offenses"—as "two of the lion cubs were transported to Antle's park in South Carolina by Antle's daughter, Tilakam Watterson, and the third lion cub was transported to Antle's park in South Carolina a short time later by Antle's daughter, Tawny Antle." The circuit court concluded that, "through application of the third party exception, conviction of the conspiracy charges is not precluded by Wharton's Rule."

As noted *supra*, Antle was charged with two counts of "unlawfully and feloniously conspir[ing] with Keith Wilson to sell, offer for sale, purchase, or offer to purchase within the Commonwealth" endangered lion cubs, in violation of Code §§ 29.1-505.1, 29.1-564, and 29.1-567. Among the statutes specifically referenced in Antle's indictments, Code § 29.1-564 expressly prohibits several substantive offenses related to the transfer of an endangered species, including the "taking, transportation, possession, *sale, or offer for sale* within the Commonwealth" of an endangered species. (Emphasis added). Relevant to our analysis here, Code § 29.1-505.1 (which was also specifically referenced in Antle's conspiracy indictments) provides:

> If any person conspires with another to commit any offense defined in this title or any of the regulations of the Board, and one or more such persons does any act to effect the object of the conspiracy, he shall be guilty of conspiracy to commit the underlying offense and shall be subject to the same punishment prescribed for the offense the commission of which was the object of the conspiracy.

The General Assembly enacted Code § 29.1-505.1 in 1989 to establish the distinct offense of conspiracy to commit any offense defined in Title 29.1 of the Code of Virginia, such as selling or offering for sale an endangered species. *See* 1989 Va. Acts ch. 362. Because there is a separate statute criminalizing conspiracy to sell or offer for sale an endangered species, the General

- 23 -

Assembly has clearly demonstrated its intent *not* to merge the offense of conspiracy to sell or offer for sale an endangered species with the separate substantive offense. *See Iannelli*, 420 U.S. at 786-91 (holding that Wharton's Rule did not apply because a review of the applicable statutes showed that Congress did not intend that conspiracy to violate a federal gambling statute be merged with the substantive gambling offense). Therefore, given (1) that Antle's indictments charged him with conspiring with Wilson "to sell" and "offer for sale" endangered lion cubs, (2) that Code § 29.1-564 criminalizes the "sale" or "offer for sale" of endangered lion cubs, and (3) that Code § 29.1-505.1 provides a separate conspiracy statute for offenses defined in Title 29.1 of the Code of Virginia, Antle (as the purchaser) could be charged with and convicted of conspiring with Wilson (as the seller) to sell endangered lion cubs. Consequently, the record before this Court on appeal shows that Wharton's Rule does not apply here.[16]

Furthermore, the record before this Court on appeal shows that Wharton's Rule does not apply in this case because "the immediate consequences of the crime rest . . . on society at large," as well as on the parties themselves. *Iannelli*, 420 U.S. at 782 (holding that Wharton's Rule did not apply because the harm from gambling offenses committed by the defendant was not restricted to the parties to the agreement). It is undisputed that African lions were placed on the endangered species list to protect them from becoming extinct. Wilson testified at trial that Antle had told him that "they had a lot of tourists. He needed lion cubs to, you know, help with his business and to extract money from tourists." In addition, Dr. Felicia Knightly testified that

---

[16] "In instances where a [lower] court's decision is correct, but its reasoning is incorrect, and the record supports the correct reason, we uphold the judgment pursuant to the right result for the wrong reason doctrine." *City of Charlottesville v. Sclafani*, 300 Va. 212, 222 (2021) (quoting *Haynes v. Haggerty*, 291 Va. 301, 305 (2016)). However, this right result for the wrong reason doctrine "does not apply unless the record on appeal fully supports the appellee's argument on appeal," and "it does not apply where the development of additional facts is necessary." *Spinner v. Commonwealth*, 297 Va. 384, 391 (2019). In making our legal determination here regarding the applicability of Wharton's Rule, we rely only on the facts found in the circuit court by the factfinder or on undisputed facts in the record now before us on appeal.

removing a lion cub from its mother within the first weeks of the lion cub's life can be detrimental to the cub's development, "can definitely cause stress between the lioness and the cubs," can disrupt the bond between the cub and its mother, and can cause the cub later to interact inappropriately with other lions. Thus, the agreement between Antle and Wilson affected more than just the parties to the agreement but also broadly impacted on the larger world and "on society at large," *id.*—and thus "invokes the policy concerns addressed by the law of conspiracy." *Richard*, 300 Va. at 391 (quoting *Stewart*, 225 Va. at 479). Consequently, Wharton's Rule is not applicable or controlling in this case.[17]

### 2. *The Sufficiency of the Evidence to Sustain Antle's Conspiracy Convictions*

Finally, having determined that Antle could be charged with and convicted of conspiracy to sell endangered lion cubs, we must address whether the evidence was sufficient to sustain his conspiracy convictions. "When reviewing the sufficiency of the evidence, '[t]he judgment of the [circuit] court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278

---

[17] "[T]he doctrine of judicial restraint requires us to 'decide cases "on the best and narrowest grounds available."'" *Holman v. Commonwealth*, 77 Va. App. 283, 296 n.2 (2023) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). "The 'best' answer to a legal question is the one with which the least number of jurists would disagree or, in other words, the one with which the greatest number of jurists would agree." *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020). "The 'narrowest' answer to a legal question is the one affecting the least number of cases." *Id.* Having determined that Wharton's Rule does not apply here, we need not reach the issue of whether the third-party exception to Wharton's Rule applies in this case.

Va. 190, 193 (2009)).  "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial."  *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

In this case, Wilson testified that he did not have any federal permit to sell Antle the lion cubs across state lines from Virginia to South Carolina.  Furthermore, Dr. Mary Cogliano testified that, between January 1, 2016, and June 30, 2022, there were no records that Antle or any of his entities in South Carolina had an Interstate Commerce permit or a captive-bred wildlife registration.  Wilson recounted that two lion cubs were born on May 7, 2018, and that Antle had agreed to purchase those lion cubs by making a prepayment via PayPal on March 29, 2018, in the amount of $5,000.  He acknowledged that the prepayment from Antle was labeled as a donation rather than as a payment for the lion cubs "[b]ecause it was illegal to sell lion cubs."  Wilson also recounted that Antle agreed to pay him $3,000 per lion cub when three more lion cubs were born on July 12, 2019.  He acknowledged that he again marked Antle's payment "as a donation when it was not a donation" and that he also put an earlier birth date on the forms for the lion cubs "[t]o make them appear older."

In short, we cannot say that the circuit court erred in denying Antle's motions to strike and his motion to set aside the jury verdict—or that the jury, as the finder of fact, was plainly wrong or without credible evidence in finding that Antle conspired with Wilson to sell endangered lion cubs.  Consequently, we certainly cannot say that no rational finder of fact could have found the evidence sufficient here to convict Antle of conspiracy to sell endangered lion cubs.  The bottom line is that, even though Antle cannot be found guilty of the offense of purchasing an endangered species under Code § 29.1-564 because *purchasing*—as opposed to *selling*—an endangered species is *not* a crime under Code § 29.1-564, Antle can be found guilty

of *conspiracy* to *sell* an endangered species under Code § 29.1-505.1 because *selling* an

endangered species *is* a crime under Code § 29.1-564.[18]

## III.  CONCLUSION

For all of the foregoing reasons, we affirm Antle's two felony convictions for *conspiracy*

to *sell* an endangered species, but we must reverse and vacate his two felony convictions for

*purchasing* an endangered species.

*Affirmed in part, and reversed & vacated in part.*

---

[18] Addressing Antle's assignment of error concerning the circuit court's instructions to the jury on Antle's conspiracy charges, it is well established than an appellate court

> review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.  This is a mixed question of law and fact.  It is error to give an instruction that incorrectly states the law; whether a jury instruction accurately states the relevant law is a question of law that we review de novo.  However, jury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required.

*Payne v. Commonwealth*, 292 Va. 855, 869 (2016) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 228-29 (2013)).  The Commonwealth argues that Rule 5A:20 precludes our consideration of this assignment of error because Antle does not provide adequate argument and reasoning to support this assignment of error.  Assuming without deciding that Rule 5A:20 does not preclude our consideration of this assignment of error, Jury Instruction Number 7 required the jury to find beyond a reasonable doubt that Antle entered into an agreement with Wilson to sell or purchase or offer to purchase an animal that is an endangered species—and to find that Antle and at least one other party to the agreement (such as Wilson) intended to commit the offense of selling or purchasing or offering to purchase an animal that is an endangered species.  Because that jury instruction correctly stated the law of conspiracy here under Code § 29.1-505.1, § 29.1-564, and § 29.1-567, and given that the jury instruction was certainly supported by more than a scintilla of the evidence, we cannot say that the given jury instruction was improper.